**UNITED STATES of America, Plaintiff,**

**v.**

**LOCAL 560, INTERNATIONAL BROTH-ERHOOD OF TEAMSTERS, CHAUF-FEURS, WAREHOUSEMEN, AND HELPERS OF AMERICA, et al., Defendants.**

**Civ. A. No. 82–689.**

United States District Court,
D. New Jersey.

Feb. 8, 1984.

As Amended March 8, 1984.

280

W. Hunt Dumont, U.S. Atty. for the Dist. of New Jersey by Robert C. Stewart, Thomas L. Weisenbeck, Asst. U.S. Atty., Leopold Laufer, Sp. Atty., U.S. Dept. of Justice, Newark, N.J., for plaintiff.

Edward A. Cohen, Schneider, Cohen, Solomon & DiMarzio, Jersey City, N.J., for defendants Local 560 and the Severance Pay Plan.

Harvey Weissbard, West Orange, N.J., for defendants Provenzano, Sheridan, Dildine, Reynolds, Sciarra and Jaronko.

Herbert New, Brenner, New & Brenner, Livingston, N.J., for defendant Trucking Employees of North Jersey Welfare Fund.

Stephen Andretta and Gabriel Briguglio, pro se.

## OPINION

HAROLD A. ACKERMAN, District Judge.

John L. Lewis, former president of the Congress of Industrial Organizations and the United Mine Workers once said that "Labor, like Israel, has many sorrows."

A careful review of the evidence in this unprecedented case reveals the verity of that observation.

It is not a pretty story. Beneath the relatively sterile language of a dry legal opinion is a harrowing tale of how evil men, sponsored by and part of organized criminal elements, infiltrated and ultimately captured Local 560 of the International Brotherhood of Teamsters, one of the largest local unions in the largest union in this country.

This group of gangsters, aided and abetted by their relatives and sycophants, engaged in a multifaceted orgy of criminal activity. For those that enthusiastically followed these arrogant mobsters in their morally debased activity there were material rewards. For those who accepted the side benefits of this perverted interpretation of business unionism, see J. Hutchinson, The Imperfect Union p. 371, (1970), there was presumably the rationalization of "I've got mine, why shouldn't he get his." For those who attempted to fight, the message was clear. Murder and other forms of intimidation would be utilized to insure silence. To get along, one had to go along, or else.

It is important to state what the evidence in this case does and does not show.

It shows that a trade union which is by origin and nature a voluntary organization is susceptible to the malicious machinations of others, as Congress perceived in enacting the Landrum-Griffin and RICO Acts.

It does not demonstrate that unions or union officials in general are riddled with racketeering or corruption. Most authorities are convinced that the overwhelming number of unions and union officials are "untroubled by the problem of corruption." Id. Crooks and racketeers are anathema to a significant portion of the trade union movement. See id.; D. Dubinsky & A. Raskin, David Dubinsky: A Life With Labor (1977); P. Jacobs, The State of the Unions (1963). See also "The RICO Civil Fraud Action in Context: Reflections on Bennett v. Berg", 58 Notre Dame L.Rev. 237, 303 n. 170 (1982).

As Professor Hutchinson observed in his book The Imperfect Union—A History of Corruption in American Trade Unions (1970) at p. 7–8:

> Corruption owes little more to immoral union leaders than it does to predatory employers who, throughout the history of American business, have sought by cheating and violence to circumvent the strictures of competition, unionization and the law. It is a companion of the corruption in politics and law enforcement which for generations has characterized some of the major cities of the nation, sheltering the guilty and embroiling the innocent in crime. It owes a debt to the insanity of Prohibition and its enduring legacy of organized defiance of the law. It thrives in the procedural jungle of the American criminal law. It stems from the social conditions of the cities—from the tensions of an immigrant society, the customs of racial discrimination and ethnic isolation, the miseries of the slums and the frustrations of the underprivileged, the ignorance of the poor and the indifference of the rich. It has, finally, drawn strength from a public philosophy which, in electing for the competitive society, has tended to trumpet only its virtues, according either praise or tolerance to the victors in a battle lightly burdened with rules."

Applying these precepts and the law applicable to this case I find that the record clearly demonstrates that the Provenzano brothers (Anthony, Nunzio and Salvatore) and their group betrayed the membership of Local 560.

David Dubinsky, former President of the International Ladies Garment Workers Union stated in his autobiography that "[r]acketeering is the cancer that almost destroyed the American trade-union movement." D. Dubinsky & A. Raskin, *supra.* The metaphor of disease is apt. *See* P. Johnson, *Modern Times* p. 102 (1983). For reasons set forth below, I have determined in this case, in accordance with law and to secure justice, to use a judicial scalpel to excise this malignancy from this union and its members.

To do any less would be to ignore the laws of the land and do a disservice to the thousands of labor leaders who earn their daily bread by honestly striving to improve the wages, hours and working conditions of their members.

This is an action brought pursuant to the Racketeer Influenced and Corrupt Organization Act (RICO), 18 U.S.C. § 1961 *et seq.*[1] Plaintiff United States alleges, *inter alia,* that Local 560 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (Local 560), together with its Welfare and Pension Funds (Funds) and its Severance Pay Plan (Plan),[2] has become, through the actions of the individual defendants, a "captive labor organization." The United States seeks, first, the appointment of a receiver or trustee to serve in the capacity of the Local 560

Executive Board until such time as the membership can freely nominate and elect new officers. The complaint also seeks injunctive relief against defendants Salvatore Provenzano, Joseph Sheridan, Josephine Provenzano, J.W. Dildine, Stanley Jaronko, Thomas Reynolds, Sr., and Michael Sciarra, *inter alia* barring them from union office until such time as a democratic election of officers by the membership may be held. Finally, the complaint seeks injunctive relief against defendants Anthony Provenzano, Nunzio Provenzano, Stephen Andretta and Gabriel Briguglio, *inter alia* barring them from any further contacts with Local 560.

The complaint charges that the "Local 560 Enterprise"[3] is an enterprise within the meaning of 18 U.S.C. § 1961(4).[4] It further alleges that the individual defendants are associated together under the leadership of defendant Anthony Provenzano as the "Provenzano Group," and that this Group conspired, in violation of 18 U.S.C. § 1962(d),[5] to violate, and actually did violate, 18 U.S.C. § 1962(b) and (c).[6]

Specifically, paragraph 12(a) of the complaint alleges that the Provenzano Group, aided and abetted by past and present members of the Executive Board of Local 560 (including defendants Salvatore Provenzano, Joseph Sheridan, Josephine Provenzano, J.W. Dildine, Thomas Reynolds,

---

**1.** Chapter 96 of Title 18, 18 U.S.C. §§ 1961–1968, was added to that title by Title IX of the Organized Crime Control Act of 1970, Pub.L. 91–452, 84 Stat. 941.

**2.** The Funds have been merged and split several times, the two most recent events being the March 1, 1974 separation of Locals 617 and 641 from the Trucking Employees of North Jersey Welfare Fund (and Pension Plan) and the May 4, 1977 merger of the North Jersey Fund and Plan with that of the Trucking Employees of Passaic and Bergen Counties.

**3.** The complaint refers to the nominal defendants (Local 560, the Fund and the Plan) collectively as the "Local 560 Enterprise".

**4.** 18 U.S.C. § 1961(4) provides:

"enterprise" includes any individual, partnership, corporations, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity....

**5.** 18 U.S.C. § 1962(d) provides:

(d) It shall be unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section.

**6.** 18 U.S.C. § 1962(b) and (c) provide:

(b) It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

Sr., Michael Sciarra, and Stanley Jaronko) unlawfully acquired and maintained, directly and indirectly, an interest in and control of the Local 560 Enterprise through a pattern of racketeering activity in violation of § 1962(b) of the RICO Act. This racketeering activity was alleged to have involved murder and the systematic use of extortion, with the latter allegedly consisting of, according to the complaint, "the wrongful use of actual and threatened force, violence and fear of physical and economic injury in order to create within Local 560 a climate of intimidation which induced the members thereof to consent to the surrender of certain valuable property in the form of their union rights as guaranteed by the provisions of Sections 157 and 411 of Title 29 of the United States Code ...." [7]

The particular acts of the defendants which allegedly created the climate of in-

7. 29 U.S.C. § 157 is section 7 of the Taft-Hartley Act, while 29 U.S.C. § 411 was enacted as Title I of the Labor Management Reporting and Disclosure Act of 1959 (LMRDA) and is referred to as the "Bill of Rights of Members of Labor Organizations." Section 411 provides:

(a)(1) Equal rights.—Every member of a labor organization shall have equal rights and privileges within such organization to nominate candidates, to vote in elections or referendums of the labor organization, to attend membership meetings, and to participate in the deliberations and voting upon the business of such meetings, subject to reasonable rules and regulations in such organization's constitution and bylaws.

(2) Freedom of speech and assembly.—Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments, or opinions; and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon any business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of meetings: **Provided,** That nothing herein shall be construed to impair the right of a labor organization to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution and to his refraining from conduct that would interfere with its performance of its legal or contractual obligations.

(3) Dues, initiation fees, and assessments.—Except in the case of a federation of national or international labor organizations, the rates of dues and initiation fees payable by members of any labor organization in effect on September 14, 1959 shall not be increased, and no general or special assessment shall be levied upon such members, except—

(A) in the case of a local labor organization, (i) by majority vote by secret ballot of the members in good standing voting at a general or special membership meeting, after reasonable notice of the intention to vote upon such question, or (ii) by majority vote of the members in good standing voting in a membership referendum conducted by secret ballot; or

(B) in the case of a labor organization, other than a local labor organization or a federation of national or international labor organizations, (i) by majority vote of the delegates voting at a regular convention, or at a special convention of such labor organization held upon not less than thirty days' written notice to the principal office of each local or constituent labor organization entitled to such notice, or (ii) by majority vote of the members in good standing of such labor organization voting in a membership referendum conducted by secret ballot, or (iii) by majority vote of the members of the executive board or similar governing body of such labor organization, pursuant to express authority contained in the constitution and bylaws of such labor organization: **Provided,** That such action on the part of the executive board or similar governing body shall be effective only until the next regular convention of such labor organization.

(4) Protection of the right to sue.—No labor organization shall limit the right of any member thereof to institute an action in any court, or in a proceeding before any administrative agency, irrespective of whether or not the labor organization or its officers are named as defendants or respondents in such action or proceeding, or the right of any member of a labor organization to appear as a witness in any judicial, administrative, or legislative proceeding, or to petition any legislature or to communicate with any legislator: **Provided,** That any such member may be required to exhaust reasonable hearing procedures (but not to exceed a four-month lapse of time) within such organization, before instituting legal or administrative proceedings against such organizations or any officer thereof: **And provided further,** That no interested employer or employer association shall directly or indirectly finance, encourage, or participate in, except as a party, any such action, proceeding, appearance, or petition.

(5) Safeguards against improper disciplinary action.—No member of any labor organization may be fined, suspended, expelled, or otherwise disciplined except for nonpayment of dues by such organization or by any officer thereof unless such member has been (A) served with written specific charges; (B) giv-

timidation which in turn allegedly induced the surrender of the members' rights are set out as subparagraphs (1) through (28)[8] of paragraph 12(a). These alleged acts are: (1) the June 1961 murder of Anthony Castellitto; (2) the August 1961 appointment of Salvatore Provenzano to the position of Trustee formerly occupied by Castellitto; (3) the September 1961 appointment of Salvatore Briguglio—the alleged murderer of Castellitto—to the position of Business Agent; (4) the February 1963 appointment of Nunzio Provenzano to the position of Business Agent following his January 1963 conviction for extortion; (5) the May 1963 murder of Walter Glockner; (6) the 1964 appointment of Robert A. Luizzi to the position of Business Agent in spite of a record of criminal convictions; (7) the May 1967 appointment of Luizzi to the position of Trustee; (8) the February 1969 appointment of Salvatore Briguglio to position of Business Agent following completion of a term of imprisonment for extortion; (9) the April 1969 appointment of Nunzio Provenzano to the position of clerk following completion of a term of imprisonment for extortion; (10) the 1970 appointment of Nunzio Provenzano to the position of Business Agent; (11) the 1971 appointment of Thomas Reynolds, Sr. to the position of Business Agent in spite of a record of criminal activity; (12) the 1972 appointment of Nunzio Provenzano to the position of Fund Trustee; (13) the 1972 appointment of Salvatore Briguglio to the position of Fund Trustee; (14) the allowance of frequent visitations by Armand Faugno and Thomas Andretta to the offices of Local 560; (15) the January 1963 appointment of Nunzio Provenzano to the position of Secretary-Treasurer;

(16) the 1973 appointment of Reynolds to the position of Fund Trustee; (17) the 1974 resumption of duties as Business Agent by Salvatore Briguglio following completion of a term of imprisonment for counterfeiting; (18) the 1974 appointment of Luizzi to the position of Fund Trustee; (19) the November 1975 appointments of Anthony and Nunzio Provenzano to the positions of Secretary-Treasurer and President, respectively, in spite of a record of convictions for extortion; (20) the February 1977 appointment of Reynolds to the position of Trustee; (21) the July 1978 appointment of Josephine Provenzano to the position of Secretary-Treasurer following Anthony Provenzano's conviction for the Castellitto murder; (22) the July 1981 appointment of Salvatore Provenzano to the position of President following Nunzio Provenzano's forced resignation as a condition of bail on a labor racketeering conviction; (23) the Executive Board's failure to recover monies wrongfully converted by Anthony Provenzano; (24) the retention of Marvin Zalk as Fund Administrator in spite of payments accepted by him from an insurance company representative during the 1950's; (25) the retention of Ralph Torraco as the Fund's independent certified public accountant in spite of his federal indictment for systematically overbilling the Fund; (26) the extortion of contributions to the defense funds of the Provenzanos and Michael Sciarra from union members; (27) the 1981 appointment of Luizzi to the position of Business Agent; and (28) associations by some of the defendants with Frank "Funzi" Tieri and Matteo Alfredo Ianniello, reputed to be organized crime members.

---

en a reasonable time to prepare his defense; (C) afforded a full and fair hearing.

(b) Any provision of the constitution and bylaws of any labor organization which is inconsistent with the provisions of this section shall be of no force or effect.

The Supreme Court has recently noted that the emphasis of § 411 is "on the rights of union members to expression without fear of sanctions by the union, which in many instances could mean loss of union membership and in turn loss of livelihood." *Finnegan v. Leu*, 456 U.S. 431, 102 S.Ct. 1867, 1870, 72 L.Ed.2d 239 (1982).

8. Subparagraphs 12(a)(26), (27) and (28) were added to the complaint upon application by the plaintiff for leave to file an amended complaint pursuant to Fed.R.Civ.P. 15(a), which application was granted on September 20, 1982.

Paragraph 12(b) of the complaint alleges that the Provenzano Group, aided and abetted by various others of the individual defendants, "unlawfully did conduct and participate, directly and indirectly, in the conduct of the affairs of the Local 560 Enterprise through a pattern of racketeering activity ..." in violation of § 1962(c) of the RICO Act. The "predicate acts" which are alleged to have constituted this pattern of racketeering activity are set out as subparagraphs (1) through (5) or paragraph 12(b). These alleged acts are: (1) the extortion of $17,100 from Walter Dorn and his company (Dorn Transport, Inc. of Rensselaer, New York) in return for "labor peace; (2) the wrongful conversion by defendant Anthony Provenzano, aided and abetted by successive defendant members of the Local 560 Executive Board, of approximately $223,785 in Local 560 funds "by means of false and fraudulent pretenses, representations, and promises, and pursuant to a scheme and artifice to defraud ...;" (3) the wrongful receipt by Provenzano Group members of payments, loans and other things of value from certain employers (Interocean Services, Inc. and Di-Jub Leasing, Inc.) in exchange for "labor peace"; (4) the unlawful receipt by defendant Anthony Provenzano, aided and abetted by Salvatore Briguglio, of certain fees, kickbacks, gifts or things of value in the form of certain Florida real estate because of, and with intent to be influenced with respect to, his actions and decisions relating to the Benefit Fund; and (5) the wrongful receipt by defendant Nunzio Provenzano, together with Irving Cotler and others, as associates of the Provenzano Group, of "labor peace" payments by certain employers, specifically Pacific Intermountain Express Company, Mason and Dixon Lines, Inc., T.I.M.E.—DC, Inc. and Helms Express.

Finally, the initial portion of paragraph 12 of the complaint contains the government's § 1962(d) allegations. It charges that defendants Anthony Provenzano, Nunzio Provenzano, Stephen Andretta, Thomas Andretta, Gabriel Briguglio and others associated with the Provenzano Group unlawfully did conspire together to violate § 1962(b) and (c) with the end of infiltrating, dominating and exploiting the Local 560 Enterprise.

In its demand for relief, the government requests: (1) that the Provenzano Group be enjoined from having any dealings, directly or indirectly, with any officer or employee of the Local 560 Enterprise or of any labor organization or employee benefit plan as defined in Title 29 about any matter which relates directly or indirectly to the business affairs of the Local 560 Enterprise or other such labor organization or benefit plan; (2) that all current Local 560 Executive Board members—Salvatore Provenzano, Joseph Sheridan, Josephine Provenzano, J.W. Dildine, Thomas Reynolds, Sr., Michael Sciarra and Stanley Jaronko—be enjoined from acting in any official capacity for or on behalf of the Local 560 Enterprise; (3) that the court appoint one or more trustees to discharge all duties and responsibilities of the Executive Board of Local 560 and such other tasks as the court may direct; (4) that at an appropriate time the trustee be instructed to conduct, with the assistance of the Department of Labor and the Department of Justice, a general election in order to select officers for the Executive Board of Local 560—the election to be structured in such a way as to ensure that the nomination, primary and final selection processes will not be vulnerable to forms of intimidation and will reflect the decision, the government requests, of at least eighty percent of the members who are eligible to vote; (5) that the court permanently enjoin all individual defendants herein from having any future dealings of any nature whatsoever, directly or indirectly, with any officer, agent, representative or employee of the Local 560 Enterprise or any other labor organization.

There have been a number of proceedings in this matter prior to trial which merit mention. First, a consent order was entered on June 15, 1982 approving the terms of a stipulation of settlement between the plaintiff United States and defendant Anthony Provenzano, *inter alia* prohibiting the latter from "any form of

association with any enterprise (within the meaning of Section 1961 of Title 18 of the United States Code), which enterprise seeks, directly or indirectly, to dominate, control, conduct or otherwise influence the affairs of any labor organization or any employee benefit plan (within the meaning of Title 29 of the United States Code)." A similar consent order was entered on September 15, 1982 with regard to defendant Nunzio Provenzano, and, on January 14, 1983, with regard to defendant Thomas Andretta.

Finally, on November 1, 1982 I denied a motion brought by defendant Local 560 pursuant to Fed.R.Civ.P. 12(b)(6) to dismiss paragraph 12(a) of the complaint for failure to state a cause of action. *United States v. Local 560*, 550 F.Supp. 511 (D.N.J.1982). Following a review of the legislative history of both the Hobbs Act, 18 U.S.C. 1951, and of the LMRDA, and relying on *United States v. Boffa*, 688 F.2d 919 (3d Cir.1982), I concluded that the rights guaranteed to union members by the LMRDA's Bill of Rights, 29 U.S.C. § 411, are intangible rights which fall within the ambit of the Hobbs Act. I further concluded that the Hobbs Act as construed in this manner was not impliedly repealed by the enactment of the LMRDA, and that conduct which is regulated or proscribed by the LMRDA may also violate RICO.[9] RICO, like the LMRDA, is, I determined, legislation intended to supplement the panoply of remedies designed to reach racketeering. *Id.* at 524–25.

By order dated March 25, 1982, my former colleague the Honorable H. Curtis Meanor directed that the plaintiff's request for preliminary and final injunctive relief be merged pursuant to Fed.R.Civ.P. 65(a)(2), and that the case proceed to final judgment. On May 20, 1982, this matter was reassigned to me from Judge Meanor.

The non-jury trial of this case began on January 25, 1983. The trial encompassed fifty-one days of testimony, lasting through May 17, 1983, the testimony comprising nearly 8,000 pages in transcript form. I have carefully considered the live testimony, the exhibits and deposition testimony admitted at trial, and the arguments of counsel. This memorandum constitutes the court's decision, and includes the court's findings of fact and conclusion of law pursuant to Fed.R.Civ.P. 52(a).

## I.

### THE PARTIES

Defendant Local 560 is an unincorporated labor association which was originally chartered on May 11, 1911 by the International Brotherhood of Teamsters. It has its offices at 707 Summit Avenue in Union City, New Jersey. As of May, 1982, it had approximately 10,000 members employed by approximately 425 companies in the metropolitan New Jersey—New York area. As such it is a labor organization engaged in an industry affecting interstate commerce within the meaning of Section 402 of Title 29 of the United States Code.

Under its constitution, seven elective officers are charged with managing the day to day affairs of Local 560. These officers are: a president, a vice-president; recording secretary; secretary-treasurer; and three trustees. These seven officers together constitute Local 560's Executive Board. This Executive Board is generally authorized and empowered to conduct and manage the affairs of the organization between membership meetings.

Defendant Trucking Employees of North Jersey Welfare Fund, Inc. and its Pension Account are located in Local 560's building in Union City. The funds were and are today welfare and pension benefit plans within the meaning of Section 1002 of Title 29 of the United States Code. As such they are subject to the provisions of the

---

**9.** I specifically determined that § 530 of the LMRDA does not prohibit the same conduct prohibited under the Hobbs Act. Since allegations of *Hobbs Act violations serve as predicate offenses in this action, I found no merit in* defendant's argument that paragraph 12(a) in essence made § 530 a predicate crime under RICO in violation of that statute's express definition of "racketeering activity". 550 F.Supp. at 524.

Welfare and Pension Plans Disclosure Act (prior to approximately September 2, 1974) and the Employee Retirement Income Security Act (after approximately September 2, 1974).

As noted previously, two other benefit plan entities were merged into the Funds during May of 1977. These were formerly known as the Trucking Employees of Passaic and Bergen Counties Welfare Fund and the Trucking Employees of Passaic and Bergen Counties Pension Fund. Both of these benefit plans were subject to the provision of the Welfare and Pension Plans Disclosure Act at the time of their merger into the Funds.

The Funds are controlled by a governing body which is composed of four trustees appointed by the Executive Board of Local 560 and four trustees appointed by two employer associations whose member companies have collective bargaining agreements with Local 560. The current employee trustees include defendant Salvatore Provenzano, defendant Stanley Jaronko, and defendant Joseph Sheridan.[10]

The Local 560 Officers and Employees Severance Pay Plan is also operated out of Local 560's offices. It is an employee benefit plan within the meaning of Section 1002 of Title 29 of the United States Code in that it provides severance pay benefits to the employees of Local 560. The current trustees of the Plan are Salvatore Provenzano and Josephine Provenzano.

A brief description of each of the remaining nine individual defendants may be useful at this point. First, Salvatore "Sam" Provenzano has been the President of Local 560 since approximately July of 1981, when the Executive Board appointed him to that position.[11] Prior to that time he had been employed by Local 560 as a Business Agent between approximately November 10, 1959 and August 8, 1961; as a Trustee between approximately August 8, 1961 and November of 1965, and again between approximately January and May of 1966; as President between approximately May of 1966 and November of 1975; and as the Vice-President between approximately December of 1975 and July of 1981.

Joseph Sheridan has been the Vice-President of Local 560 since approximately July of 1981, when the Executive Board appointed him to that position. Prior to that time he had been a Business Agent between approximately July 7, 1972 and September 1, 1978, and thereafter a Trustee between approximately September 1, 1978 and July of 1981.

Josephine Provenzano has been the Secretary-Treasurer of Local 560 since approximately June of 1978, when the Executive Board appointed her to that position. Prior to that time, she had been employed by Local 560 as an office worker from 1976 until the time of her appointment. Josephine Provenzano is the daughter of defendant Anthony Provenzano and the niece of defendants Salvatore and Nunzio Provenzano.

J.W. Dildine has been the Recording Secretary of Local 560 since approximately 1968, when the Executive Board appointed him to that position. Prior to that time he had been employed by Local 560 as a Business Agent between approximately 1963 and 1968.

Thomas Reynolds, Sr. has been a Trustee of Local 560 since February 9, 1977. Before that time, he was employed by Local 560 as a Business Agent between September 24, 1970 and February 9, 1977. He is the brother-in-law of defendant Nunzio Provenzano and the father of former Business Agent Andrew Reynolds.

Michael Sciarra has been a Trustee of Local 560 since May 28, 1981. Prior to that time he was employed by Local 560 as a Business Agent between July 7, 1972 and September 30, 1976, and again between December of 1977 and May 28, 1981. Sciarra

---

**10.** Thomas Reynolds, Sr. was a trustee of the Fund as of the time this litigation commenced and for a period after the trial began, but has since resigned.

**11.** This appointment was presumably made pursuant to the Executive Board's authority to fill officer vacancies which occur during the term of an office.

has been a member of Local 560 since approximately 1954.

Stanley Jaronko has been a Trustee of Local 560 since July 13, 1981. Before that time, he served Local 560 in the capacity of Business Agent between December 12, 1977 and February 19, 1981, and as a Trustee between February 19 and May 28, 1981.

Stephen Andretta, who testified at trial pursuant to a grant of use immunity under 18 U.S.C. §§ 6002 and 6003, was a Business Agent for Local 560 between approximately August of 1973 and October of 1976. His membership in Local 560 dates from the early 1950's, and he held the position of shop steward for Local 560 at Eazor Express Co. between the mid-1960's and August of 1973, and again between approximately October of 1976 and 1980.

The evidence at trial indicated that Stephen Andretta had known Salvatore Briguglio for over twenty years as of the early 1970's. Either through Salvatore Briguglio or his brother Thomas, Stephen Andretta met Armand Faugno sometime during the latter 1960's. Around 1971, notwithstanding his position as a shop steward with Local 560, Stephen Andretta had an ownership interest in West End Trucking Company, which was controlled at least in part by Armand Faugno. Further, during the period between approximately 1971 and late 1972, Stephen Andretta and Salvatore Briguglio would not infrequently visit Armand Faugno at the latter's place of business in Jersey City, New Jersey. During the early 1970's, Stephen Andretta also knew Frederick Salvatore Furino, and was friendly with Ralph Pellechia and Ralph Michael Picardo.

On February 22, 1979, Stephen Andretta was indicted in the District of New Jersey, along with Anthony Provenzano, Thomas Andretta, Gabriel Briguglio and Ralph Pelleccia, on RICO charges (specifically 18 U.S.C. § 1962(c) and (d)) stemming *inter alia* from the demand for and receipt of "labor peace" payments from trucking companies which serviced Seatrain Lines

between 1969 and 1977 (Seatrain Labor Peace Payoffs). On July 10, 1979, following his conviction, Stephen Andretta was sentenced to a ten-year term of imprisonment, which he is currently serving. *See United States v. Provenzano,* 620 F.2d 985, 989 (3d Cir.1980).

Gabriel Briguglio was a member and officer of Local 84 of the International Brotherhood of Teamsters, which has its offices at 1224 Anderson Avenue in Fort Lee, New Jersey, until March 31, 1980. Local 84 merged with Local 560 in May of 1980.[12]

Gabriel Briguglio was indicted on February 22, 1979, in the District of New Jersey, along with Anthony Provenzano and others, in the Seatrain Labor Peace Payoffs case. On May 25, 1979, he was convicted of those charges, and on July 10, 1979 he was sentenced to seven years of imprisonment. *United States v. Provenzano,* 620 F.2d 985, 989 (3d Cir.1980).

As to the three individual defendants who have entered into consent judgments in this matter, Anthony Provenzano was employed by Local 560 as a Business Agent between approximately 1948 and 1958, as the President between approximately 1958 and May of 1966, and as Secretary-Treasurer between November 24, 1975 and June of 1978.

Anthony "Tony Pro" Provenzano's history is a long one. On November 15, 1960 he was indicted in the District of New Jersey on one count of Hobbs Act Extortion (18 U.S.C. § 1951) relating to the demand and receipt of what is commonly known as "labor peace" payoffs from the Dorn Transportation Company between 1952 and 1959. On July 12, 1963, having been convicted on this count, Anthony Provenzano was sentenced to a term of seven years. Between approximately May of 1966 and 1970 he was incarcerated on that sentence.

During 1962, Anthony Provenzano was indicted again in the District of New Jersey for Taft-Hartley violations (29 U.S.C. § 186) relating to the wrongful receipt of a

---

**12.** It should be noted that Gabriel Briguglio has as of yet not become a member of Local 560 by

virtue of or following the merger of these two Locals.

house from Eastern Freightways Company. These charges were, however, dismissed during 1967.

In 1975, Anthony Provenzano was indicted in the Southern District of New York for conspiracy to violate the anti-kickback statute (18 U.S.C. §§ 371, 1954) relating to a proposed loan from the Utica Teamsters Benefit Fund for the renovation of the Woodstock Hotel. During July of 1978 he was convicted of these charges and sentenced to a four year term of imprisonment.

On June 23, 1976, Provenzano was indicted in Ulster County, New York, along with Salvatore Briguglio and Harold "K.O." Konigsberg, on charges of conspiracy and murder (pursuant to New York Penal Law § 580–a and § 1044) relating to the 1961 death of Anthony Castellitto. On June 14, 1978, he was convicted on the murder count, while the conspiracy to commit murder count was dismissed. On June 21, 1978, Anthony Provenzano was sentenced to life imprisonment.

Finally, on February 22, 1979, Anthony Provenzano was indicted in the District of New Jersey, along with Gabriel Briguglio, Stephen and Thomas Andretta and Ralph Pellecchia on RICO charges in the Seatrain Labor Peace Payoffs case. On May 25, 1977, he was convicted of these charges, and, on July 10, 1979, he was sentenced to a twenty-year term of imprisonment and remanded. He remains incarcerated on that conviction today. *See United States v. Provenzano*, 605 F.2d 85 (3d Cir.1979).

Nunzio Provenzano, the brother of Anthony and Salvatore Provenzano, was employed by Local 560 as a Business Agent between approximately 1963 and August 6, 1966, as a clerk between approximately 1969 and 1970, again as a Business Agent between approximately 1970 and January 25, 1973, as Secretary-Treasurer between approximately January 25, 1973 and November 24, 1975, and as President between approximately November 24, 1975 and July of 1981.

On December 26, 1961, Nunzio Provenzano was indicted in New York County, New York, along with Salvatore Briguglio and a third defendant, on charges of conspiracy and Attempted Grand Larceny (New York Penal Law § 580–a and 1294) flowing from a scheme to demand what might be characterized as "labor peace" payments from the Braun Company and Hubert J. Braun, Jr. during December of 1961 (Braun Payoff Demand). On January 29, 1963, he was convicted of attempted grand larceny, and, on March 5, 1963, he was sentenced to a term of two to four years. He served this sentence in New York between approximately August of 1966 and February of 1969.

On September 4, 1980, Nunzio Provenzano was indicted in the District of New Jersey, along with Irving Cotler, Salvatore Provenzano, and Michael Sciarra, for RICO violations (specifically 18 U.S.C. § 1962(c) and (d)) stemming from the wrongful demand and receipt of "labor peace" payments from four trucking companies between 1971 and 1980, a series of incidents often referred to as the "City-Man Labor Peace Payoffs." On May 5, 1981, Nunzio Provenzano was convicted on these charges, and, on July 7, 1981, he was sentenced to a ten-year term of imprisonment. He is presently incarcerated on this conviction.

Finally, Thomas Andretta, the brother of Stephen Andretta, has been a member of Local 560 during several periods since 1955, including from approximately August 30, 1955 through November 30, 1956; from October 29, 1959 through January 15, 1960; from January 10, 1962 through November 29, 1965; and from February 27, 1978 through July of 1979.

On March 31, 1967, Thomas Andretta was indicted in Middlesex County, New Jersey, along with Armand Faugno, for having used threats to injure in the collection of a loan between March 13 and 23, 1967, in violation of N.J.S.A. 2A:105–4 (Middlesex County Loansharking Transaction). *See State v. Andretta*, 61 N.J. 544, 545, 296 A.2d 644 (1972). On May 17, 1973, Thomas Andretta pleaded guilty to that charge. On July 10, 1973, he was sentenced to

serve from one to two and a half years in prison.

During early 1968, while free on bail in the Middlesex County Loansharking Transaction case, Thomas Andretta was indicted in the District of New Jersey, along with Frederick Salvatore Furino, on charges of Theft from Interstate Shipment, in violation of 18 U.S.C. § 659, relating to the theft of Skil Tools at the Canny Trucking terminal during January of 1968 (Skil Tools theft). Following his guilty plea in that case he was, on or about April 17, 1969, sentenced to a one year term of imprisonment and remanded.

On July 22, 1971, Thomas Andretta was indicted in the District of New Jersey, along with Salvatore Briguglio, Armand Faugno and three others, on counterfeiting charges under 18 U.S.C. §§ 371, 472 and 474 (Counterfeiting case). He later plead guilty and, on July 10, 1973, was sentenced to fourteen months of imprisonment.

During the early 1970's except when he was incarcerated, Thomas Andretta, along with Ralph Picardo, was a regular and not infrequent visitor to the Local 560 offices, where he and Ralph Picardo were hosted by Salvatore Briguglio. During roughly this period—between approximately 1970 and late 1972, Thomas Andretta was apparently employed by Armand Faugno.

On February 22, 1979, Thomas Andretta was indicted in the District of New Jersey, along with Anthony Provenzano and others, in the Seatrain Labor Peace Payoffs case. Following his conviction in that matter, he was sentenced on July 10, 1979 to a twenty-year term of imprisonment. *United States v. Provenzano*, 620 F.2d 985, 989 (3d Cir.1980). He is currently incarcerated on this sentence.

The other individuals who figure in this matter, but who are not named as defendants, include Robert A. Luizzi, who has been a Business Agent for Local 560 since September of 1978. Prior to that time he was employed by the Local as a clerk between approximately 1960 and 1963, as a Business Agent between 1964 and 1967, and as a Trustee between May 15, 1967 and November of 1980. Luizzi also held the position of Trustee for the Funds from March 12, 1974 until November of 1980.

Salvatore Briguglio had been a member of Local 560 since the 1950's and was employed by it as a Business Agent from September of 1961 to August 5, 1966; from April 25, 1969 to June of 1973; and again from February of 1974 until his death on March 21, 1978. Salvatore Briguglio also held the position of Trustee of the Passaic and Bergen Funds from 1972 until June of 1973 and from early 1974 until January 25, 1975.

On December 26, 1961, Salvatore Briguglio was indicted in New York County, New York, along with Nunzio Provenzano on the Braun Payoff Demand scheme. He was convicted of Attempted Grand Larceny and was incarcerated in New York between approximately August of 1966 and February of 1969 on that conviction.

On July 22, 1971, Salvatore Briguglio was indicted in the District of New Jersey, along with Thomas Andretta, Armand Faugno and three others, in the counterfeiting case. Following his plea of guilty on these charges, he was sentenced on July 10, 1973 to a term of fourteen months of imprisonment. Salvatore Briguglio was incarcerated on this sentence until approximately February of 1974.

Between the late 1960's and the mid-1970's, except during the periods when he was incarcerated, Salvatore Briguglio often socialized at the Chateau Renaissance Restaurant in Hudson County, New Jersey, a place also frequented by Stephen and Thomas Andretta, Armand Faugno, Frederick Salvatore Furino and Ralph Michael Picardo. Salvatore Briguglio's involvement with Picardo and the Provenzano Group is also exemplified by the fact that during the period of the Seatrain payoffs, Salvatore Briguglio promoted the interests of Picardo by persuading Salvatore Provenzano to facilitate a meeting between Picardo and Thomas Durkin (Seatrain's attorney) so that Picardo could drum up addi-

tional business for Picardo's trucking company.

On June 23, 1976, Salvatore Briguglio was indicted in Ulster County, New York, along with Anthony Provenzano and Harold Konigsberg for the 1961 Castellitto murder. On March 21, 1978, while under indictment in that case, Salvatore Briguglio was shot to death on Mulberry Street in New York, New York.

Armand Faugno was indicted on March 31, 1967, along with Thomas Andretta, in the Middlesex County Loansharking Transaction case. *State v. Andretta*, 61 N.J. 544, 545, 296 A.2d 644 (1972). On July 22, 1971, Faugno was indicted in the District of New Jersey, along with Salvatore Briguglio, Thomas Andretta and three others, in the Counterfeiting case.[13] During December of 1972, while under indictment in both of these cases, Armand Faugno "disappeared."

Ralph Michael Picardo was a member of Local 560, as well as being the principal operating officer of several trucking companies, including Lift-Van Transport. Picardo was a friend and associate of Stephen Andretta and had an affiliation with Seatrain Lines.

On February 22, 1979, Ralph Pellecchia was indicted, along with Anthony Provenzano and others, in the Seatrain case. On April 26, 1979, he pleaded guilty to related tax charges contained in that indictment. On July 2, 1979, he was sentenced to two and a half years of imprisonment.

Frederick Salvatore Furino was, during the late 1960's and early 1970's, a friend and associate of Stephen Andretta, Thomas Andretta, Salvatore Briguglio, and Michael Sciarra, and knew Ralph Picardo. In March of 1968, Furino was indicted in the District of New Jersey in the Skil Tools Case. Later, during the latter part of the 1970's, Furino operated a trucking company which provided non-union labor to the Canny Trucking operation which was under contract to Local 560. On June 11, 1982, the body of Frederick Salvatore Furino was recovered. The crime has never been solved.

Finally, Salvatore Sinno played a prominent role at trial as one of the government's chief witnesses. Sinno, a self-described criminal, was an early associate of the Provenzanos and their friends.

## CREDIBILITY FINDINGS

### Salvatore (Sam) Provenzano

During the course of his direct testimony Salvatore Sinno was asked about Salvatore Provenzano:

Q Did you ever engage in any illegal activity with Salvatore Provenzano?

A No.

Q Did you ever talk to Salvatore Provenzano about illegal activity?

A No.

Q Mr. Sinno, did you ever receive any instruction from Anthony Provenzano about what you could or should talk to Salvatore Provenzano about?

A Yeah, they—he never wanted Salvatore Provenzano, to get involved in anything illegal. We discussed that many a times, yes.

Q Can you tell us specifically what Mr. Anthony Provenzano's instructions to you were?

A He wanted to keep him more or less clean. He didn't want to get him involved in any way or other in illegal activities.

Q Did he give you the reason that, as you put it, he wanted to keep Salvatore Provenzano clean?

A Well, I imagine—

MR. WEISSBARD: Objection.

THE COURT: Don't imagine. Objection sustained. Answer the question.

A Yes. He mentioned that quite often, in regard, he didn't want Salvatore Provenzano with any kind of a record or anything, but, for the Union's sake.

---

**13.** While the exhibits relating to these two indictments may have inadvertently or incorrectly been ruled inadmissible during the trial in this matter, Salvatore Provenzano's testimony provides an alternative basis for my findings of fact on these matters.

Sam Provenzano presently is an International Vice President of the Teamsters Union, President of Joint Council # 73, and President of Local 560. He thus wields great power on a national as well as local level.

He is intelligent, affable and likeable. Had Sam Provenzano decided to shed the company he has kept for at least 25 years, there is little doubt in my mind that he would occupy a prominent place on labor's scene today.

The evidence is highly persuasive that from the late 50's on into the 70's, Anthony (Tony Pro) Provenzano, ran this union with an iron hand whether in or out of prison or office. Sam and Nunzio played musical chairs in minding the store for Tony to satisfy the technical requirements of the law.

At some point in the 70's Sam came into his own. With power at his fingertips, he ran the show and still does. Did he stay "more or less" clean as Sinno had testified? He did not. Most of the time he helped to steer the ship the way Tony wanted it and made sure the same crew remained on board.

I listened in amazement to him persistently proclaim his belief in the innocence of his brothers and other members of this criminal syndicate with respect to various crimes that they had been convicted of or pled guilty to.

Was he naive, blind or deaf? No. Salvatore Provenzano, in my judgment, knows the truth and is oblivious to it.

Why? A revealing answer was provided on April 27, 1983 when he was asked on cross examination:

Q Today, given all that has happened with Local 560 and all the indictments and this civil complaint and everything like that, if another indictment came down like the Seatrain indictment, would you, today, think it a prudent thing as the president of the union to make an inquiry to try and find out what the circumstances were with respect to the union contract and the alleged violation of the contract?

A To answer your question, yes. If I would have done it by reading the indictment is something else. I think it is prudent. I thought I answered that before, that I started to check out what was going on.

Q Okay.

A I never denied that. What I am saying is I didn't bother to read the indictments. But I was interested in what took place.

Q All right, sir.

Now, I think I understand you. You were interested then—you were interested at the time of Seatrain in what was going on?

A Yes. Because my brother was involved, and I couldn't see how he was involved in the situation. That was my main concern.

Q Your brother?

A Yes, sir.

Q As opposed to the union?

A *He comes first.* I will say that.

(emphasis supplied)

He still does. For Sam Provenzano inherited a legacy of corruption which has been preserved by him to this very day. In speaking of Tony in partial response to my question he said: "He would never do anything to hurt this membership."

The record is otherwise.

## JOSEPHINE PROVENZANO

Miss Provenzano, daughter of Anthony Provenzano, has been the Secretary-Treasurer of Local 560 since 1978 when she was elected to that office at the age of 23 to succeed her father who had been convicted of murder. She presently earns $64,000 per year plus perks.

She has an engaging personality and has no illusions as to why she was appointed. She said:

A ... what motivated them to do that, I have to say it is because—not only that I was a Provenzano, that counts for weight, but I was Tony's daughter. See,

there is only one Tony to them. Now, there was a big issue in this case as to what members believe, what they read in papers or don't they believe, were they influenced by it? I have to tell you the truth. *I don't think they would have cared if it was true or not true.* Because they know what he did for them. To them, in their minds, what did the press ever do for me? What did the government ever do for me? They take my taxes and they go on about a whole platform of things they disagree with the government. Look what Tony did for me. He gave me pensions, eyeglasses, he gave me dental. I have welfare payments. He saw me on the street and took me in the bar. We had a drink. He remembered my wife's name. He asked me how my daughter was, that had the concussion in the hospital. There is something about my father, sir,—not that you can't get mad at him. You can get mad at him. There is something about the man. I mean you can't understand until you're like one of the guys from 560. They just—I would have never believed it, if I wasn't in those meetings and I didn't hear those people go wild about him. I mean they liked him, but it is just incredible to me. It is just absolutely incredible to me. And to them, I am Tony's daughter....

There can be, to the members of Local 560, no higher recommendation in this entire world. And if I don't believe that, well, I wouldn't be here right now because I wouldn't be a member of the executive board of Local 560.

It is—I don't know how to put it into words. It is more like an emotion you feel. He has an uncanny ability of making people relax, and making them know he cares. He is not a big deal. He is not very well-educated, book-wise. He might have gone to the fourth or fifth grade. But you give him a contract, he can read it. I don't know how he can read it. He just can. You put him in a room with 500 truck drivers. Nobody in this world is going to talk to them that they will understand more than my father. You put him in a room with ladies, and you never see him. My girlfriends—when my father—there is articles in the papers or—they cry. They call me on the phone in tears. 'How could they say that about your father?'

I tell them, 'Hey, listen, everyone is entitled to their opinion. You know better. Don't cry. Don't get upset. Don't read it. That's all.'

He just commands such love and respect, and admiration and loyalty, not only from his family, but from the members of Local 560. Anyone that comes into contact with him. I don't know what else to say, your Honor. I mean, I don't even know if I expressed myself properly or adequately, but that is just how I feel. I am so proud to be my father's daughter. [Emphasis supplied].

Whatever experience Miss Provenzano lacks, she makes up in candor. Her understandable love for her father transcends everything else.

### STANLEY JARONKO

As pointed out previously, Mr. Jaronko has been a member of the Local since 1949 and a business agent since 1977. He was a shop steward for 17 years. He is a trustee of the union and a union representative to the Trucking Employees of North Jersey Fund (TENJ).

He was asked:

Q Have you, to the best of your knowledge, ever done anything that a member might think was designed to intimidate him from coming to meetings or speaking out his mind?

A Nope, never did it. Never will.

He was asked:

Q Mr. Jaronko, if Nunzio Provenzano was able to come back to the union tomorrow, you as one member of the Executive Board would vote him on in a minute, I take it, right?

A Yeah. I believe there is a law that he can come back. But after he does what is he supposed to do? Yes, I would.

Q And if that law didn't exist and he could come back tomorrow, you would take him back tomorrow, right?

A Yes. And I believe the members will, too.

Q And you would do the same thing with Anthony Provenzano, assuming he could come back tomorrow, you would take him back tomorrow?

A Yes.

With respect to the Maislin Terminal incident involving Local 560 member August Muller, described *infra*, I find Mr. Jaronko's testimony unconvincing and his version of the story unbelievable.

A careful review of Mr. Jaronko's testimony reveals that, with one exception, he steadfastly refused to accept a verdict of guilty involving the Provenzanos. His rationale—they were convicted on the testimony of an informer.

Overall, I found Mr. Jaronko to be fiercely loyal to the Provenzanos, completely indifferent to the history of criminal activity on the part of various individuals, including Anthony and Nunzio Provenzano. Mr. Jaronko's fealty to the present regime is steadfast beyond question. His testimony left much to be desired.

### J.W. DILDINE

A business agent of Local 560 and Recording Secretary since 1968, Mr. Dildine impressed me as an intelligent individual who in retrospect "sold himself to the devil" twenty years ago when he agreed to come to work for Anthony Provenzano as a business agent.

He testified in an extremely lucid manner when confronted with the sordid history of the local and its leaders. He was calm and for a time quite impressive and persuasive.

He testified as follows:

"THE COURT: What is your feeling regarding all these involvements affecting Mr. Nunzio Provenzano?

"THE WITNESS: My personal feeling is that I would have to judge Nunzio Provenzano as well as Salvatore Provenzano and Anthony Provenzano in my personal contact with them and my personal relationship with them.

"THE COURT: Yes, sir.

"THE WITNESS: It has always been one of a strict business, from the office. Over the years we had grown, I guess, close because of our business association, within that office.

"THE COURT: Yes, sir.

"THE WITNESS: Outside of that office, we did no, how would I put it, personal contact where we socialized or whatever. I came on the scene as a, as, the expression, a new kid on the block. I had to prove myself. I came in through the appointment of Mr. Anthony Provenzano. I dug in. I worked hard. I tried to repay that appointment by dedication and hard work. So my association with these gentlemen were always above board.

"They never asked me to be involved in any kind of skullduggery, nor was I ever aware that there was any skullduggery.

"It was strictly, in that office, as even today, these people worked very hard. They put in a lot of hours, and they really tried to do the job for the membership.

"So in answer to your question, your Honor, I don't know that there has ever been a time that I, and I have had many conversations with Anthony as well as Nunzio, when he was the President, and even today, Salvatore, and their main concern was and is today getting the job done, and beyond that, I don't know what more I can say.

"THE COURT: All right. Would it be fair then to conclude that, insofar as Nunzio is concerned, Nunzio Provenzano, that you don't believe he was ever involved in any skullduggery, to use your expression?

"THE WITNESS: To my knowledge, no, sir.

"THE COURT: And you believe in his innocence?

"THE WITNESS: Yes, sir.

"THE COURT: Okay. Now—

"THE WITNESS: That was in the June thing. The other one, that is another matter.

"THE COURT: Well, I presume that your opinion is the same with respect to the union conviction?

"THE WITNESS: Yes, sir.

"THE COURT: The most recent conviction?

"THE WITNESS: Yes, sir.

"THE COURT: All right. You were here when the government produced this Professor Summers, were you not?

"THE WITNESS: Yes, sir.

"THE COURT: Were you in the room?

"THE WITNESS: Yes, sir, I was.

"THE COURT: Do you recall him testifying one day that, and I am paraphrasing it now, that, so you will forgive me, Mr. Dildine, that, it's just not natural, based on his expertise in unions, particularly after the state conviction, for nobody to come out and say, 'he done wrong.' Forgive my English.

"What is your reaction to that, to someone who is no longer the new kid on the block?

"THE WITNESS: My reaction, I was asked I think at the very beginning of my testimony yesterday what my educational background was, and compared to Professor Summers, I guess, my formal education is rather in remiss.

"However, I guess, I have had 55 years at the school of hard knocks, and it's to—to try to compare his analyzation from a classroom type of projection, you have to live it, you have to be a part of it.

"You have to be on the firing line. You have to be up front. You have to deal with these problems on a daily situation. Mr. Anthony Provenzano is a very unique personality. He has a charisma about him that he could relate to those people sitting out there in the meetings, in the meeting rooms. To try to dissect what the professor had to say about it, when you asked him what he thought, in his learned position, would be the remedy, his analyzation, without ever meeting me, without every talking to me, knowing me and my background, my family, or any of the other people that I work with, his immediate response was to remove everybody from office, right now, and appoint a trustee, and through cross examination by Mr. Briguglio, he brought out the fact that he had been offered the job as that trustee by the government.

"And I am sitting over there, your Honor, and I am a kid from the poor side of the block, and it's for, for me, it's a frightening thing to be confronted, and to be sitting in this seat here as a defendant and be charged with violations of the Hobbs Act, where I extorted members, and to be in violation of everything that is holy, as far as being a union representative goes.

"And to be charged by the United States Government in this, it's frightening, and I will tell you something, I have spent many hours on this, and I could probably walk away tomorrow with a small retirement, but I wouldn't do it under these conditions, because I have never, in my past, have done anything to deserve this type of treatment, not from the Government, or anyone else, or the members that I serve.

"THE COURT: Do you feel it is a vendetta?

"THE WITNESS: Yes, sir, I do, to the 'nth' degree, I think. I have been associated with the people in my office for some 20 years.

"THE COURT: Yes, sir.

"THE WITNESS: And there have been convictions. There have been millions of dollars spent, of taxpayers money. They have, they don't have to answer to anyone for this, to my knowledge.

"They have unlimited time. We are here today having to defend ourselves, we have to pay for our own counsel fees, and there are those among us, your Honor, that, we are in financially terrible shape.

"Some of us may have to mortgage our homes in order to pay our legal fees. But even in the face of that, I can stand here

and I can look at these three gentlemen, eyeball to eyeball. I can look at Mr., what is his name, Dumont, and I can look at you, your Honor, and tell you that I have not, nor have my associates, sitting here today, since we have been in office, violated any law, federal or otherwise. Anybody can sit back and Monday morning quarterback and say, why did you appoint young Josephine or why did you do this. But these were done in good faith, forthright, and whatever, and each one of these things, I have partaken in it, I have participated in it, but I do not bow my head to this court, from any actions that I have taken.

"Anyone can say, well, look, here was Tony got convicted, Nunzio was convicted, Sal Briguglio was convicted. You brought these people back to work. Why did you do these things? Why was he given a raise in pay? Why was he given a half pension? And all those things, your Honor, if you had the luxury of time, if you could attend one of our meetings, unannounced, and just sit in a corner where they won't know who you were, you would see the response of those members.

"It's not choreographed. Our people stand up for what they think they want. We are mandated by their actions. The raise in pay came from them, the half salary came from them, and each one of these items, it was not a frivolous type of action by the executive board or whatever. All these items were checked out legally.

"We got legal opinions as to whether or not we could do these things. All these pay raises and whatever, or back pay that was owed. It was reported on the tax report, the LM 2's or whatever.

"This is not a secret, your Honor.

"These people, they came in here and they try to, they bring in people to testify that I have never met, I don't know anything about them, they don't know anything about me, and yet they would try to sway this court, and you are the judge, and you are the jury and the trier of fact in this, and it will be your opinion, is what will weigh heavy to we as a group, and I say to you, your Honor, that we, as a group, have

not indulged as a board, in any kind of violation of our members' rights.

"Now, I was rather longwinded, but—

"THE COURT: It's all right.

"THE WITNESS: But I feel, your Honor, there are things that you must know.

"THE COURT: I am interested in this.

"THE WITNESS: I feel that—

"THE COURT: Tell me about the present President, Salvatore Provenzano. Tell me about him. He is here in the Courtroom?

"THE WITNESS: Salvatore Provenzano is the President of our Local Union. He is also the President of the Joint Council for it, in the State of New Jersey.

"He has been the Secretary for the Eastern Conference of Teamsters, whose main office is in Bethesda, Maryland and he is also an International Vice President.

"THE COURT: Of the International—

"THE WITNESS: Of the International.

"THE COURT: Right.

"THE WITNESS: And he wears many hats, he has a wide variety of responsibilities.

"And through the years that Mr. Salvatore Provenzano has been delegated to these authorities, of course, his knowledge, has expanded immensely because he has been exposed to many more things on a national level and the conference level than those of us in the local, of course, are not exposed to.

"He has been on the firing line through negotiations, top level. So all these experiences that he has acquired over the years, he has been there I guess since the early 1960 or 1961, so he has had twenty some years as an officer and he was also a member prior to that as a driver, and his expertise has come over the so-called road of hard knocks, too.

"He has earned disappointments. He has earned his way.

"And those in the higher authority have evidently seen things that his leadership

ability and they have appointed him into those offices, originally as a Vice President, International, and since that time, he has also run in elections and he has been re-elected.

"So my appraisal of Mr. Provenzano, not because he is sitting here, because over the 20 years we have not always agreed on things.

"But we argue these things out at board meetings and we come to a conclusion. He has been one that has always, in my, to my knowledge, has requested the members to take a part, an active part. He even tells us in the board meetings, if you got something to say, say it.

"So my association with him has been, as with Anthony and Nunzio, has been always with a great deal of respect, and I hope that the respect is a two-way street.

"THE COURT: Is he popular?

"THE WITNESS: Yes, sir, he is very popular."

\*　　\*　　\*

"THE COURT: Okay.

"Have you observed any political dissidence insofar as his tenure as a union office holder is concerned?

"THE WITNESS: No, sir, I think that over the years, of course, when Anthony Provenzano was first taken away from the membership, and then Salvatore, we call him Sam, so I will refer to him as Sam.

"THE COURT: Sam, I gathered that. I am observing the formalities.

"THE WITNESS: Sam took over the reins. I think there was a period of time that the members, well, they were, you know— he was Sammy's—Tony's brother, but in a very short time, I think that they recognized his ability and his zeal for the job, and as time went on, of course, he went, he was appointed a general organizer, and then from that, of course, he was made an international vice-president, and of course, this gave our local a great deal of recognition to the rest of the Country.

"He was a part of that recognition, because of his dedication to the job, and I think that Sam probably puts as much energy into this job as, and maybe more, than most international vice-presidents.

"THE COURT: So what you are telling the Court is he has earned his own spurs?

"THE WITNESS: Yes, sir, without question, and I don't say it because he is sitting here."

I did not get the impression that Mr. Dildine was completely comfortable with the role he assumed. History teaches us that every so often those that keep their mouths shut, and eyes and ears closed in the face of evil are called to account. In a way his culpability is greater than most others. He really should have known better. By his inaction he facilitated the spread of the disease. As Edmund Burke stated in a letter to William Smith dated January 19, 1795, "[t]he only thing necessary for the triumph of evil is for good men to do nothing."

Mr. Dildine spoke glowingly of his father's role in labor's struggles against the Ford Motor Company in the 30's. When he decided to leave his job as a terminal manager in 1963 and accept Tony Provenzano's offer he reflected:

Q When did your next discussion take place and what did you do about it in the meantime, if anything?

A Well, in the meantime, of course, I had a lot of sleepless nights, I guess you would call it, because I had worked pretty hard at what I was doing, and I was trying to get ahead in life, I guess you would call it, and I felt that there was a future for me in that job, although I was being underpaid, I felt that the pay would come eventually if I really proved myself out. With the title comes the pay, I guess, but I felt that, well, I would like to get involved in this, and I did a lot of thinking about this, because my history as a young kid, I go back, back in the thirties during the Depression years, and my father, he worked for Ford Motor Company in Detroit, and he was one of the first three men to be fired for union activities back during that period.

And I recalled it and I relived that over and over again, and the fact that he was almost killed several times leading the pickets against, at that time, a company that was so big you just could never beat it. And he was one of the leaders of that strike. He was part of the so-called walkway, where they drop buckets with lead in the bottom on the pickets, when they brought in strike breakers and whatever. And I recall during those days as a kid walking picket lines with my father, and those were hard days, when unions were starting. I never forgot those days.

So that had a lot to do, I think, with my decision, and I thought deeply and I talked with my family about it, and whatever, and it is going to be a whole new change of life, lifestyle, and I also felt that, hey, my father would have been proud of me. So that had a lot to do with it.

It is difficult to reconcile his professed idealism with the record.

## SALVATORE SINNO

Mr. Sinno is a former racketeer, one of the murderers of Anthony Castellitto, and was the chief witness against Tony Provenzano and others at the murder trial. In this case he also assumed a prominent role in furnishing the court with a graphic account of how it all began.

His testimony linking Anthony and Nunzio Provenzano to one of the most notorious crime families in New York, and his recitation of a pattern of intimidation and criminal activity which accompanied the takeover of Local 560 had the stamp of credibility. Sinno, a huge man, seemed right out of central casting. As I listened to his tale, it was obvious that this was the real life version of that cinematic presentation "On the Waterfront."

Sam Provenzano in the course of his testimony in exculpating his brother, spoke of various stupid mistakes Tony had made in various criminal entanglements which had landed him in prison. The biggest mistake Tony ever made may have been to initiate Sinno into his criminal fraternity. Sinno's testimony in this case was extremely valuable. The past is truly prologue.

## JOSEPH SHERIDAN

Shop Steward since 1965, Business Agent since 1972, Trustee since 1978, and Vice President of 560 since 1981. Mr. Sheridan presented a picture of an individual whose family had taken an active role in the union in the pre-Provenzano period and who had inherited the mantle. The other business agents, Mr. Sheridan appeared to me to feel very comfortable with his earnings of $995 per week. He is not a boat rocker. When asked about Nunzio Provenzano he said:

"A Sir, if you know Mr. Provenzano, Nunzio Provenzano like I know him, and I know him quite a few years, I don't believe those allegations.

"I know him to be an excellent labor leader for his people, a good family man and a man I would be very proud to recognize in the morning. I don't believe them.

"Q And if he were eligible to serve tomorrow, you, as trustee and vice-president of the Local, would bring him back tomorrow?

"A I would be happy to."

When asked about Anthony Provenzano he said:

"A Sir, let me go back. I only served a couple of years with Mr. Anthony Provenzano. I believe he came back in '75 to '78. I was on '72, he wasn't there. So my experience with Anthony Provenzano is only as a member of Local 560 for that period of time.

"I know the men idolized him and I can see why they idolized him. He was a man, he come off the trucks the hard way. I don't think that is something, I think I said in my testimony, I said the man has charisma that I wish I had. I don't have it. He is the type of man that can walk in a room with 5,000 hard hats could be in there, and he is well-respected no matter where he goes, because I don't think there is a man in our union, or in the labor

movement, that can say anything against him, about this man.

"He is a fighter. He fights hard. And I will give you an example like I respect him for. I think he just was incarcerated and he come out for a short time. I think it was a two-week period.

"Q Which incarceration?

"A I think, I don't know if it is on the murder one or on the Seatrain. He was out for about—a couple of weeks. And with all on that man's mind, and any conversation I had with Mr. Provenzano was hello, how are you, and nothing other than that.

"I am telling this Court today, your Honor, just the way I feel about this man. I am choked up about it, that is the type of guy he was. He would come down to my desk. He says 'Joey, how are you? I am sorry to hear your wife has cancer.' He says, 'Anything I can do to help you, let me know.' I said, 'I appreciate it, Mr. Provenzano.' He says, 'Hang in there and do the best you can.'

"That's the type of guy he is, with all that is on his mind, somebody else might not even think of it, but he thought, just a little something like that, that little charisma like that man has. Tomorrow morning, if you let him out of jail he would win the election overwhelmingly, with all the supervision you want to put up, he would walk away with the election.

"THE COURT: If you felt he murdered Castellitto, would you still feel the same way?

"THE WITNESS: No, I wouldn't.

"THE COURT: Why?

"THE WITNESS: If anyone takes anybody's life, I wouldn't even care if it was an animal, I certainly wouldn't respect him or want any part of him or have anything to do with him.

"THE COURT: If you felt that he extorted Dorn's, how would you feel about it?

"THE WITNESS: I certainly wouldn't respect him or admire him.

"THE COURT: Would you vote for him?

"THE WITNESS: Excuse me?

"THE COURT: Would you vote for him?

"THE WITNESS: I would have to weigh that one, sir, because if he was convicted in my conscience, he did something wrong like that, no, I don't think I would.

"THE COURT: What about Nunzio's conviction in 1981, if you felt he was truly guilty?

"THE WITNESS: If I thought Mr. Nunzio Provenzano was truly guilty of the crime, I know I wouldn't.

"THE COURT: You know what?

"THE WITNESS: I would not vote for him.

"THE COURT: All right.

"Let me ask you this. Mr. Dildine testified in this courtroom that he felt the government has pursued a vendetta. I think that was the word he used originally, and then I picked up on it, against Local 560.

"THE WITNESS: Yes.

"THE COURT: You were in the Courtroom for that?

"THE WITNESS: Yes.

"THE COURT: Okay. What does the government have to do, in your mind, I am talking about Joseph Sheridan's mind, if I may use the shopworn phrase, to put the ball across the line, to convince you that these individuals who Mr. Laufer has been talking about the last few minutes, were guilty of crimes. What—in other words—let me back up a moment.

"Like all of us, I am sure you read the newspapers, right?

"THE WITNESS: Yes, sir.

"THE COURT: Every day we pick up the paper, we read Joe Smith convicted of murder or robbery in some hamlet in the United States; right?

"THE WITNESS: Yes, your Honor.

"THE COURT: Okay. You read that article, you don't know Joe Smith, I am assuming that. What reaction do you have, as a normal human being?

"THE WITNESS: As reading that in the article, I certainly wouldn't think much of the individual who caused that crime.

"THE COURT: Do you think the man has had a trial by a jury, right?

"THE WITNESS: Yes.

"THE COURT: The jury has deliberated and found him guilty beyond a reasonable doubt.

"THE WITNESS: Yes, sir.

"THE COURT: Would it be fair to conclude that, on the basis of what you read, the man is guilty? He has been found guilty; right?

"THE WITNESS: Yes, sir.

"THE COURT: All right. Now, all these cases that we have been talking about, with one exception, I think, I mentioned to Mr. Dildine the plea of guilty by Mr. Sal Briguglio, the counterfeiting case, there were verdicts handed down. Why, in your mind, Joseph Sheridan's mind, do you have a different reaction?

"THE WITNESS: Sir, I guess, like you say, if you read something in the paper and you don't know somebody, you are fast to judge an opinion, which we all do. I do it myself.

"THE COURT: Right.

"THE WITNESS: But I got to tell it to you the way I know it, is that I didn't really know the Provenzanos. I just knew of them being our leaders in the union and I personally, as Joe Sheridan, never really got to know them until I became part of an organization. I can speak for my family, my wife, and I am not just saying that in here, I consider myself a very devout man, a religious man, and I bring my family up this way. I have been in their company on not many occasions. They are respected people in their community. They have lovely children. They brought them up to respect their parents, and I don't see this aura of, you know, what we are talking about, because I am there almost—I am there 11 years, and I can say that, as God is my judge, all I know these people to be is, no one ever, in the 11 years I am up

there, said to me, Joe Sheridan, this is the contract.

"Your Honor, I believe you asked me the question yesterday, when you said, can you, as Joe Sheridan, make a decision without picking the phone up? I can tell you companies where—and this is not done in all unions, where if I go out to negotiate a contract and if I know I got the best that I can, I don't have to go to that phone, sir, and I never have.

"I will just say, that's the contract. If the people ratify it, I will come in the next day and I will tell whoever the president is at the time, sir, this is our contract. I got this and I got that. That is how I know these people, sir.

"THE COURT: I understand that. But as a devout individual, and that is the way you have described yourself.

"THE WITNESS: Yes, sir.

"THE COURT: Haven't you ever questioned, that is my—haven't you ever questioned in your own mind, I mean aside from the fact that you are on the payroll, and I am being real up front with you—"

\* \* \*

"THE WITNESS: I am sitting in the courtroom when Mr. Sinno was here, and we are going through testimony, and they are talking about the Mafia, and the 'hit men', and all these here people, your Honor, like I said, unless I am most naive people in the world, I am up there 11 years, I never met that type of individual, I never come in contact with them, and I don't know these people to be anything but good labor leaders, and responsible family men. I will go to my grave saying that.

"They are good fighting people for the people they represent. Sure, the things that went on in the past, you can say quarterbacking on a Monday morning, maybe this or that should have been done, but they try, even to the membership, Sam said to me, he says, we have the contract for the Meadowlands, he said Joey, do you think you can get the Brendan Bryne Are-

na, he says, I got to try something and see if we can't get this membership out."

\* \* \*

"THE WITNESS: Your Honor, you know the hardest thing I think you have to fight, being a member of our Local, you can be invited out for a party, has nothing to do with unions or any union officials there, and it has happened to me quite a lot. The conversation, what do you do for a living. Business agent for 560. Oh, boy. You know, it is that type of stuff where, I think the papers have done a job, and it is a household word, as far as, you know, I think everyone thinks that this is a racketeer local, and it is a dominated local."

Joseph Sheridan: decent, devout, blind and bought.

## MICHAEL SCIARRA

Michael Sciarra has been a member of Local 560 since the mid-1950's. He was appointed a business agent in July of 1972, and held that position until 1976. He was reappointed in 1977. He became a trustee of the union in 1981.

Mr. Sciarra, in very emotional terms, spoke of his love for the union and its members and their love for him. During the course of his testimony, he stressed his devotion to his duties and his desire to do everything which would benefit the membership. Yet, the government was able to demonstrate that his "love" did not cause him to vigorously police Canny Trucking Company, where his good friend Fred Furino was funnelling in non-union drivers for Canny's operation. The situation allegedly came to light only after Mr. Furino was found murdered. Mr. Sciarra testified that he was shocked when he learned of it. As noted elsewhere in this opinion, I am persuaded that his explanations concerning this whole affair were lame.

His love affair with the Provenzanos is more passionate. On that score the record is clear. He was asked:

Q In fact, you stated at your deposition that Anthony Provenzano is your idol; is that correct?

A Yes.

THE COURT: Is your what?

THE WITNESS: My idol.

He was further asked by me:

THE COURT: Now, you recall my question, my question was, do you recall Miss Josephine Provenzano telling the Court, even if all these charges were true, the local union members would welcome back the Provenzanos?

THE WITNESS: Overwhelmingly. Overwhelmingly.

THE COURT: Even if the charges were true.

THE WITNESS: Even if the charges were true.

THE COURT: Would you welcome them back?

THE WITNESS: Yes. I got my own opinions. I am not the same as the members. I told you my opinions and my feelings.

The members would welcome them back with open arms. Nunzie, whom I have known a little better, I got closer to over the years than I did with Anthony, was a hell of a business agent, your Honor.

THE COURT: So that even if, and you have expressed yourself very strongly, and I am not being critical, and very emotionally concerning the charges in which you were involved in and which you were acquitted of. Even if you knew that Nunzio was guilty, and there was no bar, would you bring the guy back?

THE WITNESS: I would definitely vote for him. He would help tremendously.

THE COURT: I was going to ask you why, in other words—

THE WITNESS: Because of his knowledge of the business, his handling of people, he knows how to handle men, and he handles women very well, too, by the way. And I don't mean that facetiously. We have a lot of women we represent. And the women and the men, I have never heard one bad remark about Nunzie Provanzano.

THE COURT: And—

THE WITNESS: I would welcome him back with open hands, any one of them.

THE COURT: That includes Mr. Anthony Provenzano?

THE WITNESS: Yes.

THE COURT: In other words, if you knew, for example, that the charges—if you were convinced that the charges involving the murder of Anthony Castellitto were true insofar as Mr. Anthony Provenzano is concerned, and you had the power, I realize, it sounds—it sounds rather improbable, but I am trying to get your mind set—

THE WITNESS: I understand.

THE COURT: I am trying to find out how you think, Mr. Sciarra. If somehow the doors would open, and Anthony Provenzano would come out—

THE WITNESS: I would pray.

THE COURT: You would what?

THE WITNESS: I pray for that.

THE COURT: You would welcome him back; is that what you are saying?

THE WITNESS: Yes.

THE COURT: I am not trying to put words in your mouth.

THE WITNESS: Yes, I would.

THE COURT: Can you tell me why, assuming you knew that—

THE WITNESS: Providing all the laws permitted him to?

THE COURT: Yes.

THE WITNESS: Again, his leadership, his—I don't know about his knowledge too much any more, being he has been away so much. I know his leadership and the following he had. Man, I would gladly welcome him back, your Honor.

I know he would be a value to the Local Union. The membership alone loves him.

THE COURT: Would that be true with respect to Mr. Stephen Andretta?

THE WITNESS: Stephen, yes. Stephen was a good business agent.

THE COURT: All right. In other words, you don't believe the charges?

THE WITNESS: Your Honor, I know Steve very well. We are very close, him and I. He is one of the reasons for my going down to the Company K a lot, when he was down there.

THE COURT: Okay. If you felt the charges were true, nevertheless, you would welcome him back?

THE WITNESS: If the charges were true on Steve, I would have him back. He doesn't know anything but the trucking business, your Honor. If he is forgiven by the law and by the Lord and he served his time, okay. I will gladly welcome him back.

It is perfectly understandable why Mr. Sciarra supported the motions to vote Mr. Anthony Provenzano a salary increase and a half pension. Mr. Sciarra is an excellent example of how the Provenzano Group has been able to survive and dominate Local 560.

## II.

▮ Continuously between approximately the late 1940's and the present, Anthony Provenzano has been the leader of a group of individuals who have been associated together in fact as an enterprise within the meaning of 18 U.S.C. § 1961(4), the activities of which have affected interstate commerce.[14] This group of individu-

---

**14.** The defendants' assertion that the characterization of the Provenzano Group as an enterprise represents an unfair and prejudicial "last minute" altering of the government's theory of the case is without merit. I find that paragraph 12 of the complaint gave adequate notice to defendants as to this allegation. A mere recharacterization of facts and claims which had been previously fully alleged in the complaint, to harmonize them with changing caselaw, *see United States v. Riccobene,* 709 F.2d 214 (3d Cir.1983), cannot be considered prejudicial. It is, as Judge Wood has stated, "a basic principle of the Federal Rules of Civil Procedure that a litigant is not bound by the selection of a particular theory of relief." *Lance, Inc. v. Ginsburg,* 210 F.Supp. 272, 274 (E.D.Pa.1962). Moreover, this theory was fully tried by the government with the implied consent of the defendants. The court may accordingly base its decision on this theory and may deem the pleadings amended accordingly. *MBI Motor Company, Inc. v. Lotus/East, Inc.,* 506 F.2d 709 (6th Cir.1974); *Smith v. Ellerman Lines, Ltd.,* 247 F.2d 761, 766 (3d Cir.1957).

als, the "Provenzano Group", has included (in addition to Anthony Provenzano), Nunzio Provenzano, Stephen Andretta, Thomas Andretta, Gabriel Briguglio, Andrew Reynolds, Salvatore Briguglio (until his murder in 1968), Salvatore Sinno (until his defection in 1961), Harold "K.O." Koningsberg (until his incarceration in the mid-1960's), Armand Faugno (until his "disappearance" in 1972), Ralph Michael Picardo (until his defection in 1975), Ralph Pellecchia (until his imprisonment), and Frederick Salvatore Furino (until his murder in 1982). The evidence adduced at trial clearly demonstrates that these individuals conspired to and actually did conduct the affairs of the Provenzano Group Enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c) and (d), involving murder and labor racketeering offenses on a protracted and continuing basis so as to enrich themselves and perpetuate the existence of their criminal association. The evidence further demonstrates that the Provenzano Group has maintained an ongoing organizational structure in the form of a hierarchy and protocol, which has controlled the affairs and conduct of the Provenzano Group's associates during approximately the past thirty-five years. Finally, it has also been conclusively demonstrated that the Provenzano Group has had an existence separate and apart from simply the pattern of activity in which it has engaged.

### A.

Sometime during the late 1940's, Anthony Provenzano invited Salvatore Sinno to become associated with him and others in a criminal organization, the Provenzano Group herein. Sinno accepted this invitation. From this association, Sinno learned that the Provenzano Group, operated as an organized racketeering enterprise, and, through its leader, was a faction of a larger New York-based criminal organization. This larger organization was at that time headed by Mike Miranda, who was serving as "acting boss" while its former head Vito Genovese was imprisoned. Prior thereto the organization was led by an individual whom Sinno identified as "Lucky" Luciano.

The larger criminal organization of which the Provenzano Group was a faction had a settled hierarchy. The positions which constituted this hierarchy were "boss", "underboss", "captains", and "soldiers", which were also known as "made members" or "button men". Anthony Provenzano was a part of this hierarchy and held the position of "made member" within the larger organization. Others who held such positions during Sinno's period of association with the Provenzano Group included Toby D'Amico, Mike Sabella, Earl Collucio, Tony Salerno, Peter LaPlaca, Bobby Manna, Gyp DeCarlo, Nick Perry, Pete DiFeo and Jerry Catena (the latter four of whom were "captains").

The associates or members of this larger criminal organization were then permitted by its protocol to engage in a variety of criminal activities, such as gambling, extortion, trafficking in stolen property and the corruption of law enforcement authorities to ignore criminal violations, but were prohibited from involvement in narcotics, prostitution and counterfeiting. Pursuant to the directions of Anthony Provenzano, and apparently in accordance with the larger organization's protocol, Sinno and others participated in the commission of a number of criminal offenses indicative of the relationship between the larger criminal organization and the Provenzano Group. One such criminal offense was the operation by Sinno and others of an illegal monte card game in New York City over a period of several years, from which the larger organization received a "tribute" payment of three percent for having allowed the game to operate. An illegal monte card game was also operated in Hoboken over a period of time which involved the payment of

I further note that the government has elected not to press the averments regarding the recovery of salary increases (paragraph 12–a–23 of the complaint), the averments regarding Marvin Zalk (paragraph 12–a–24) and those regarding Ralph Torraco (paragraph 12–a–25) in view of testimony that there was reliance upon advice of counsel.

money to law enforcement authorities for "protection." Jersey City was the situs for the operation of an illegal dice game over a several year period prior to 1961, another criminal offense. Anthony Provenzano provided Sinno with $5,000 in operating capital for the Jersey City game in exchange for a ten percent share in the profits.[15]

In September of 1961, Salvatore Sinno disassociated himself from the Provenzano Group. At that time, Nunzio Provenzano was an associate of the Provenzano Group and, like Sinno, had been proposed for full membership in the larger criminal organization. Nunzio Provenzano's involvement in both organizations is highlighted by his presence at the "drop" where, by prearrangement, Sinno "gave up" his truck to be "hijacked."

Following the period described by Salvatore Sinno, the Provenzano Group continued to exist as a racketeering enterprise, notwithstanding the incarceration of Anthony Provenzano between approximately the mid-1960's and 1970 and the incarceration of Nunzio Provenzano (as well as Salvatore Briguglio) between approximately 1966 and 1969. First, I find that between approximately 1969 and 1977, Anthony Provenzano, Gabriel Briguglio, Stephen Andretta and Thomas Andretta unlawfully conspired to and did conduct the affairs of an enterprise (the Provenzano Group) through a pattern of racketeering activity, consisting of multiple violations of the Taft-Hartley Act, 29 U.S.C. § 186, and involving both Local 560 and several carriers for Seatrain Lines. Further, between approximately 1971 and 1980, Nunzio Provenzano and others conspired to and did conduct the affairs of an enterprise through a pattern of racketeering activity, again consisting of multiple violations of the Taft-

Hartley Act, and involving four interstate carriers.

The continued vitality and viability of the Provenzano Group is further demonstrated by a number of pieces of inferential evidence which, taken together, lend cumulative support to this proposition. First, at a deposition on August 17, 1982, Andrew Reynolds, a Business Agent for Local 560, invoked his Fifth Amendment privilege and refused to answer when asked whether he knew Bobby Manna, and whether he had met with Nunzio Provenzano and Bobby Manna at the Fountain Restaurant and Cafe, located at the corner of Houston and Sullivan Streets in New York City. This meeting, which had lasted for approximately one hour on July 15, 1980, had been observed by the F.B.I. During Sinno's time, Bobby Manna had been a member of the Genovese-led larger criminal organization, and had been a partner of Anthony Provenzano and Salvatore Sinno in the Jersey City dice game. Bobby Manna had also been held in contempt on July 19, 1971 for refusing to answer questions concerning organized crime and racketeering. *In re Manna*, 124 N.J.Super. 428, 307 A.2d 619 (App.Div.1973).[16]

During the August 17, 1982 deposition, Andrew Reynolds also invoked his Fifth Amendment privilege in refusing to answer when asked whether he knew Matthew Ianniello, whether Reynolds reported to Ianniello concerning his activities as an employee of Local 560, whether Ianniello and the "Genovese Family" control Local 560 through Reynolds and others, and whether he had met with Nunzio Provenzano and Ianniello on Mulberry Street on July 29, 1980. The three had been observed together by the F.B.I. Matthew Ianniello is reputed to be a "captain" in the "Genovese Family" and has been identified as a friend of Anthony Provenzano as well as an ac-

---

**15.** Anthony Provenzano also caused an employer to place Salvatore Sinno's name on its payroll so that Sinno's tax records would reflect a legitimate source for his income from the various gambling activities seemingly undertaken at Anthony Provenzano's behest. This provides another example of an act consistent with and reinforcing of the organizational structure of the enterprise and which promoted both organizational and individual well-being.

**16.** While I may have inadvertently excluded this opinion from evidence, I may, of course, take judicial notice of it.

quaintance of Salvatore and Josephine Provenzano and Robert Luizzi. Additionally, Salvatore Provenzano had testified at a deposition on July 29, 1982, and in his testimony at trial that he knew Matthew Ianniello through Anthony Provenzano and considered Ianniello to be a friend of Anthony Provenzano.

Andrew Reynolds further invoked his Fifth Amendment privilege in refusing to answer whether he knew Funzi (Frank) Tieri. Salvatore Provenzano testified at his deposition that Frank Tieri is reputed to be a significant organized crime figure. One of his connections to Local 560 and the Provenzano Group is through Vincent Passaro, who has been a Local 560 Business Agent for Local 84. Vincent Passaro is, according to Thomas Reynolds, reputed to be the "son" of Frank Tieri.

This invocation of the Fifth Amendment privilege by Andrew Reynolds—who was appointed to the position of Business Agent within Local 560 by Nunzio Provenzano and retained in that position by Salvatore Provenzano—is admissible in a civil trial against both him and his coconspirators under Rule 601(d)(2)(E) of the Federal Rules of Evidence, as well as the Executive Board of Local 560. In these circumstances I draw an adverse inference from his silence.[17] *See Baxter v. Palmigiano*, 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976). Specifically, I find that had he responded truthfully to those questions, his answers would be incriminatory.

### B.

During the past thirty years, Anthony Provenzano and other members of the Provenzano Group have engaged in a pattern of criminal and other improper acts, the object of which was to gain control over and to exploit the Local 560 Enterprise.

First, between approximately January 1, 1952 and June 1, 1959, within the District of New Jersey and elsewhere, Anthony Provenzano, while an official of Local 560, extorted "labor peace" payoffs from Walter Dorn and his company, Dorn Transport, Inc. of Rensselaer, New York. During this period, Anthony Provenzano held the positions of Business Agent, and later, of President, and obtained a total of $17,100 from Dorn.[18]

Next, at the time of his nomination and appointment as a Business Agent for Local 560, Anthony Provenzano directed Salvatore Sinno and Earl Coluccio to attend the membership meeting in question in order to intimidate and if necessary discipline any "rambunctious people"—meaning those members who might presume to voice opposition to his appointment. Similar tactics were employed by the Group in preparation for Local 560's January 10, 1960 election, which was hotly contested. As one such step, Anthony Provenzano directed Nunzio Provenzano, Thomas Reynolds and Robert Luizzi to "sign up" ineligible members in order to increase the Group's voting strength. Salvatore Sinno, at Anthony Provenzano's behest, persuaded some six of his friends to vote for the Provenzano slate in that election, although each of them was, in fact, ineligible to so vote. Salvatore Sinno himself was able to (and did) vote in the 1960 election because Anthony Provenzano had brought Sinno's membership "book" up to date by falsifying entries to show that Sinno was a member of Local 560 in good standing.

Third, in order to enhance his own power and that of the Provenzano Group within Local 560, and apparently to punish what he regarded as a breach of the Group's protocol, Anthony Provenzano recruited Harold "K.O." Konigsberg and Salvatore Briguglio to kill Anthony Castellitto—which they, together with Salvatore Sinno and others, did on June 6, 1961. Prior to his "disappearance," Anthony Castellitto was one of the most popular members of

---

**17.** I note that Andrew Reynolds no longer holds the position of Business Agent.

**18.** This pattern was to some extent repeated when, between November 30 and December 12,

1961, Salvatore Briguglio and Nunzio Provenzano attempted to extort labor peace payments (attempted grand larceny) in the Braun Payoff Demand case, discussed *infra.*

Local 560. He had been, for example, the only candidate to run unopposed in Local 560's 1960 election. Anthony Provenzano considered Anthony Castellitto to be a serious threat to his control over Local 560 and felt that Anthony Castellitto might be assisting the opposition party within Local 560.[19]

To carry out Anthony Provenzano's directive, Harold "K.O." Konigsberg enlisted Salvatore Sinno and others sometime shortly before June 6, 1961 to assist him with the planned murder.[20] On June 6, 1961, in Ulster County, New York, Konigsberg, Sinno, Salvatore Briguglio and others killed Anthony Castellitto by striking him on the head with a blunt object and strangling him about the neck with a cord. Thereafter, Anthony Provenzano rewarded Konigsberg for his part in the Castellitto murder by paying him the sum of $15,000. Anthony Provenzano rewarded Salvatore Briguglio for his part in the Castellitto murder by making him a Business Agent in Local 560.

On or about December 20, 1962, approximately one month after Anthony Provenzano had been indicted in the Eastern Freightways case, the membership of Local 560 voted, upon the motion of Michael Sciarra, to increase the salary of its President, Anthony Provenzano, from approximately $20,800 to approximately $45,800 annually. Sciarra testified that his motivation in making the motion was the common knowledge within the Local that Anthony Provenzano faced substantial legal expenses in connection with his defense on the Dorn charges. His salary was again increased on February 14, 1963, and upon the motion of Stephen Andretta, from approximately $45,800 to approximately $95,800 annually. Andretta testified, in turn, that he was prompted to make the motion because of the feeling that Anthony Provenzano should make as much money as Jimmy Hoffa, who was at the time President of the International Union. Hoffa disappeared on July 30, 1975.

On or about March 13, 1963, Anthony Provenzano announced to the attendees of a membership meeting of Local 560 that he was not taking these two salary increases and would not do anything to impoverish the Local. This was again confirmed at the October 13, 1963 membership meeting, when Anthony Provenzano told those attending that, "as of today, I have not taken either of the salary increases granted me." On or about July 21, 1966, the membership of Local 560 voted, upon the motion of Michael Sciarra, as seconded by Stephen Andretta, to reduce the salary for the office of the President from $95,000 to $20,800, to be effective with the appointment of Salvatore Provenzano as President on May 6, 1966.

On or about January 30, 1969, Anthony Provenzano (then in prison) caused his attorney, Joseph F. Walsh, to mail a letter to Local 560 requesting that it issue a check to Anthony Provenzano in the amount of $25,000 (less appropriate deductions) "on account of back salary due and owing to him." This letter was subsequently received by the Local 560 Executive Board. As a result of this request, the Local 560 Executive Board paid to Anthony Provenzano the sum of $25,000 annually each year between 1969 and 1976. These payments together represented all but approximately $48,785 of the amount accumulated through his salary increases. During the period encompassed by these payments, Anthony Provenzano did not hold office in Local 560, being in fact disqualified until November of 1975 from holding any union office.

Local 560 received no benefit in exchange for the payment of these funds to Anthony Provenzano. Contrary to his representation to the membership on March 13, 1963, the payments (totalling $223,785)

---

**19.** Anthony Provenzano also expressed the belief that Castellitto had informed on him to law enforcement authorities regarding the "labor peace" extortion of Dorn Transport.

**20.** Konigsberg, a reputed loan-sharker, at that time operated a "claims collection" agency in the building owned by Local 560 in Union City, New Jersey, and occupied those premises at the sufference of Anthony Provenzano.

did in fact "impoverish" the Local. His ability to exact these payments from Local 560 provides further evidence of the strength and dominance of the Provenzano Group and its exploitation of Local 560 for its own purposes.

Next, on May 24, 1963, in Hudson County, New Jersey, Walter Glockner was murdered. Prior to his death, Glockner had been a vocal critic and opponent of the Provenzano brothers. In particular, on the evening before his death, during the course of a Local 560 meeting chaired by Salvatore Provenzano, Glockner had voiced opposition to the appointment of J.W. Dildine as a Business Agent. After the meeting, Glockner attempted to approach Salvatore Provenzano in order to further vent his feelings on the matter. As he did so, he became embroiled in a heated exchange and shoving match with Thomas Reynolds. Ralph Pellechia, Local 560's Sergeant-at-Arms at the time, restrained Glockner and forceably evicted him from the premises. The following morning, Glockner was shot to death in front of his residence in Hoboken.

The government at trial produced Manuel Galagarza as a witness. Mr. Galagarza testified that he was a witness to the Glockner murder in 1963. Specifically, he testified that just as he was about to step outside to leave for work at about 6:00 a.m. on May 24, 1963, he heard the sound of a gun shot. He immediately opened his door and stepped outside. Looking across the street, he saw a man holding a gun. The man fired the weapon two or three more times at Glockner, turned around and saw Galagarza, and then jumped into a waiting car and sped away. Galagarza at trial identified the murderer as Thomas Reynolds.

Both Galagarza and Reynolds were held in custody for a week as "material witnesses" in the Glockner murder. In spite of seeing Reynolds twice during this period (once at a "line-up" in New York and once at a chance encounter in the Hudson County Jail), Galagarza did not identify Reynolds as the man he had seen shooting Glockner. He explained at trial that he had thus "lied" to the grand jury and others because he had been in fear for his own safety and that of his mother and sisters. Galagarza testified that while he was being held in the Hudson County Jail, one day he found a note under his plate at lunch which read, "Keep your mouth shut." This, he said, only served to reinforce his original decision not to fully reveal what he knew.

Galagarza's decision to testify as to Glockner's murderer's identity came in 1982. Galagarza wrote the FBI expressing a willingness to so testify, allegedly to "get it out of [his] system," particularly given that he had a heart condition and could therefore "drop dead" at any moment. I find that an even greater motivating factor was the fact of his incarceration. At the time he wrote the letter volunteering his testimony, Galagarza had just begun serving an eight year sentence on a charge of assault with intent to maim. By the time he testified, he had served approximately sixteen months of this sentence, and had three months to serve before becoming eligible for parole for the first time.

I find Galagarza's identification of Reynolds as Glockner's murderer to be not sufficiently credible to meet the government's burden of proof on this issue. Because Galagarza's testimony was the only proof the government adduced as to the murder itself, I must find that the government has not established the Glockner murder as a predicate act.

During the mid-1960's, Anthony Provenzano consolidated his power and control over Local 560. Shortly after his election victory in 1965, he, Nunzio Provenzano and Salvatore Briguglio commenced serving prison terms resulting from their respective convictions in the Dorn Extortion and Braun Payoff Demand cases. Nevertheless, the Provenzano Group remained strong, and new associates came to prominence. The new associates—Stephen Andretta, Thomas Andretta, Armand Faugno, Ralph Michael Picardo and Frederick Salvatore Furino—were "tied in" to the Group principally through Salvatore Briguglio.

Andrew Reynolds was also later brought in through Nunzio Provenzano. Certain of these new associates joined forces with the other members of the Provenzano Group in continuing to further acquire, maintain and exploit control over Local 560.[21]

Between approximately December of 1969 and June of 1977, Anthony Provenzano, Stephen Andretta, Thomas Andretta and Gabriel Briguglio, together with others unlawfully accepted "labor peace" payments from certain employers—namely, Interocean Services, Inc. (between approximately mid-1969 and mid-1974) and Di-Jub Leasing, Inc. (between late 1974 and early 1977). The specific circumstances of this series of incidents were as follows: (a) Anthony Provenzano and Stephen Andretta were, during the relevant periods, officers and employees of Local 560; (b) Local 560 did represent or would admit to membership employees of these two employer companies; and (c) the payments were made with the intent on the part of the employer companies to secure "labor peace" from Local 560 by influencing the officers and employees of the Local with respect to their official actions and duties. These actions were all in violation of 29 U.S.C. § 186(b) and 18 U.S.C. § 2.

Between approximately early 1974 and late 1977, Anthony Provenzano, aided and abetted by the other associates of the Provenzano Group (and in particular by Salvatore Briguglio and Stephen Andretta), did receive and agree to receive certain fees, kickbacks, gifts and things of value because of and with intent to be influenced with respect to his actions and decisions relating to certain questions and matters concerning the Local 560 Benefit Plan (the

Trucking Employees of Passaic and Bergen Counties Welfare and Pension Fund), in violation of Sections 1954 and 2 of Title 18 of the United States Code.

Specifically, sometime before September of 1974, Salvatore Provenzano, then President of Local 560 as well as a Trustee of the TENJ Fund, met Thomas Romano in Florida. Romano there told Salvatore Provenzano that he was interested in obtaining a loan from the Local's benefit fund. Salvatore Provenzano explained the benefit fund loan application procedures and advised that any such application should be sent to Marvin Zalk, the fund administrator. As a result, during September of 1974, the trustees of the Passaic and Bergen Fund, one of whom was Salvatore Briguglio, granted a construction loan of approximately $4.6 million to a company whose principals included Thomas and Frank Romano, in connection with a condominium project in Hallandale, Florida. One month later, during October of 1974, the Passaic and Bergen Fund paid $1,147,000 to KRR, Inc., a corporation whose shareholders consisted of Thomas and Frank Romano and another person, in return for recreational leases on property located in Lauderhill, Florida.

On or about June 18, 1975, Thomas Romano advised the trustees of the Passaic and Bergen Fund that the market was very bad for sales of condominiums in Florida. The Fund therefore renegotiated the terms of the prior construction loan and additionally granted Romano Brothers Ltd. (a Florida limited partnership comprised of Thomas and Frank Romano) an additional loan of approximately $1.8 million for the purpose

---

**21.** These new associates were also involved in Provenzano Group § 1962(c) racketeering activities other than those which focused on the control and exploitation of Local 560. First, during March of 1967, Thomas Andretta, and presumably Armand Faugno, conspired together to use extortionate means (the threat of bodily harm) to collect a debt from an individual in Middlesex County, New Jersey. Second, during 1968, Thomas Andretta and Frederick Salvatore Furino agreed together to steal some $100,000 worth of Skil Tools from a shipment at Canny Trucking Company in Elizabeth, New Jersey,

for which each was later convicted. Third and finally, during 1971, Salvatore Andretta and presumably Armand Faugno, along with three others, conspired together to violate the laws relating to counterfeiting. Armand Faugno disappeared while both the counterfeiting and extortion charges were pending.

Shortly thereafter, during 1974, Anthony Provenzano himself agreed with another to violate 18 U.S.C. § 1954 with respect to the payment of a kickback for a loan from the Utica Teamsters Fund.

of purchasing additional adjacent land and making improvements thereon for the project. It is interesting to note that in the period between January 30 and May 5, 1975, the Romanos had some eighteen telephone conversations with Salvatore Briguglio, despite the latter's resignation as a fund trustee on January 25, 1975. I find sufficient circumstantial evidence to support the inference that these calls were part of an effort to influence the Passaic and Bergen Fund trustees, an effort carried out by Salvatore Briguglio, Stephen Andretta, and Anthony Provenzano.

On or about November 1, 1974, Anthony Provenzano purchased from Thomas Romano the premises at 531 Palm Drive, Hallandale, Florida. The tax stamps on the deed indicate that Anthony Provenzano paid Romano $115,000 for the property, however, as the defendant Fund's appraiser, Jesse V. Vance, Jr., testified, Provenzano in fact only paid the equivalent of $101,798.[22] The government's expert appraiser, John A. Blazejack, testified that at that time the property was in fact worth $145,000, while Vance testified that it was worth $101,000. Eliminating certain contested aspects of each appraiser's report, and averaging the remaining minor differences, I find that the approximate value of 531 Palm Drive on the purchase date was $124,000, I therefore find that Anthony Provenzano "benefited" to the extent of $22,000 in the transaction, a substantial reward or kickback for his services in influencing the Passaic and Bergen Fund trustees.

On or about June 7, 1977, Anthony Provenzano made a second purchase from Thomas Romano, this time the premises at 643 Palm Drive, Hallandale, Florida. Provenzano paid Romano $180,000 for this property. Again using the most credible portions of both appraisers' reports, I find that this property was in fact worth $222,500 at that time, a "benefit" for Anthony

Provenzano of $42,500. This again reflects a substantial kickback for him as a result of the Provenzano Group's efforts on behalf of the Romanos.

During August and September of 1975, there were at least eleven additional phone calls between the Romanos' Florida offices and Stephen Andretta at the offices of Local 560. These calls all came at a time when the Romano loan was in severe jeopardy and default appeared imminent. Stephen Andretta testified at trial that he had no business dealings with the Romanos and that the Romano calls were simply directed to him by the switchboard operator at Local 560 in the absence of Salvatore Briguglio and Paul Campi. He further testified that he merely told the respective callers that the party they were calling was out of the office. The Romanos' telephone bills, however, containing the penciled notations by their secretary showing the name of the "callee", reflect that there were no calls to Salvatore Briguglio during the time period that these calls were made to Stephen Andretta, although they do indicate that Briguglio received various calls both before and after the period in question. I find that it is unlikely that Stephen Andretta's name would have been penciled in had he not been the intended callee—particularly in light of the number of calls for which that notation is found.

Stephen Andretta's testimony is completely unconvincing. I find that his testimony on this matter supports an inference that he deliberately lied in order to conceal the true facts relating to his involvement in the Romano loan transactions.

Further, I find that the circumstantial evidence is strong and convincing that Anthony Provenzano, aided and abetted by Salvatore Briguglio and Stephen Andretta (whose involvement is clear despite the government's specific failure to include him as to this incident in the complaint) engi-

---

**22.** As part of the 531 Palm Drive transaction, Anthony Provenzano conveyed to Thomas Romano two properties, 520 South West First Street and a vacant lot in Pompano Acres, as partial consideration for his purchase of 531 Palm Drive. In so doing, the parties attached a value of $50,000 to 520 S.W. First Street and $27,000 to the Pompano Acres lot. Both appraisers agreed, and I find, that the parties to the transaction overvalued these two properties by approximately $13,250, thereby benefitting Anthony Provenzano by that amount.

neered the entire Romano loan/kickback deal for their gain and at the membership's expense. Salvatore Provenzano testified that he remonstrated with his brother when he (Salvatore) learned of the first property sale. While his instincts were correct, his fervor to protect the union membership was subordinated to his brother's will. His brother came first.

Next, continuously between approximately January of 1971 and July of 1980, Nunzio Provenzano, Irving Cotler and others, unlawfully received and accepted and agreed to receive and accept certain payments, loans and deliveries of money and other things of value from certain employers—namely, Pacific Intermountain Express Company (between approximately January of 1971 and July of 1980), Mason and Dixon Lines, Inc. (between approximately November of 1976 and June of 1979), T.I.M.E.–DC, Inc. (between approximately November of 1975 and April of 1979) and Helms Express (between approximately January of 1977 and April of 1979), the employees of which companies were employed in an industry affecting commerce. Specifically, it was found that (a) Nunzio Provenzano and others were officers and employees of Local 560; (b) Local 560 did represent and would admit to membership certain employees of the said employer companies, and (c) the said payments, loans and deliveries were made with the intent on the part of the said employer companies to secure "labor peace" from Local 560 by influencing the officers and employees of Local 560 with respect to their official actions and duties—all of which violated 29 U.S.C. § 186(b) and 18 U.S.C. § 2.

The power of the Provenzano Group and its ability to exploit Local 560 for its own purposes was again apparent in 1979. On or about November 9th of that year, the membership of Local 560 voted to award Anthony Provenzano an annual "pension" which would equal one-half of his salary at the time of his retirement. This step had been necessitated, in the view of the Group by the fact that a break in service (resulting from his imprisonment between 1966 and 1970 in the *Dorn* case) had disqualified him from receiving a pension from the Teamsters.

Thereafter, on June 21, 1978, Anthony Provenzano was sentenced to life imprisonment for the murder of Anthony Castellitto. As a result, he was forced to "retire" from Local 560. On November 21, 1978, Nunzio Provenzano told the attendees at a Local 560 membership meeting that the Executive Board had acted on the membership's vote to grant Anthony Provenzano a pension, and he thanked the membership for having supported the motion. Pursuant to this action, Anthony Provenzano received the following amounts as his "pension" from Local 560: 1979—$27,612; 1980—$27,612; 1981—$28,143.

In his testimony, Salvatore Provenzano stated that he had "no idea" how Local 560 would benefit from the payment of this one-half pension. Trustee Michael Sciarra also knows of a no benefit to Local 560 which flows from these payments other than to keep "the members happy—they voted for it." The ability of the Provenzano Group to exact these payments is clearly demonstrative of its strength, influence and continuing ability to control and exploit Local 560 for its own purposes—at the expense of the membership. The audacity of these payments in the face of Anthony Provenzano's conviction (and sentence of life imprisonment) for murder is remarkable.

As part of the effort to gain control over and exploit Local 560, continuously throughout the period between June of 1961 and the present, Anthony Provenzano and other associates of the Provenzano Group—aided and abetted by various past and present members of the Local 560 Executive Board—systematically used extortion in order to induce a significant portion or segment of Local 560's membership to surrender certain property. Specifically, this extortion took the form of the wrongful use of actual and threatened force, violence and fear of physical and economic harm, particularly the loss of the ability to

earn a livelihood, and it was used to induce or coerce the membership into surrendering their federally-protected rights to participate in the affairs of Local 560 in a democratic manner. This extortion affected interstate commerce and the movement of articles and commodities in such commerce.

The extortion of these intangible property rights occurred through a series of actions committed by the Provenzano Group. The first of these was the "disappearance" of Anthony Castellitto in 1961. At the time of his disappearance, Castellitto was an extremely popular official of the Local. Although nominally a part of the Provenzano faction, prior to this death he enjoyed the support and confidence of the "Green Ticket", which had vigorously challenged the Provenzanos during Local 560's 1960 election, and which continued to represent a formidable political opposition to the incumbent associates of the Provenzano Group.

Almost immediately after Castellitto's disappearance, rumors circulated among Local 560 members (as well as in the news media) that Salvatore Briguglio—then a known associate and supporter of Anthony Provenzano—had been criminally involved in the incident. As a result, the disappearance generated a perception among the membership that anyone who represented an actual or potential threat to the Provenzano Group's dominance and control over Local 560 ran the risk of physical injury. The nature and intensity of that perception has been such that it survives to the present day and is capable of exerting a substantial influence over the thoughts and actions of the current members of Local 560. It should be noted that no effort has ever been made by the Provenzano Group (or by the Local 560 Executive Board) to dispel this perception.

The extortionate effect of the Castellitto "disappearance" was further amplified or highlighted by the ambush slaying of Walter Glockner in 1963. Again the pattern was repeated: As previously noted, Glockner had, on the night before his murder, spoken out at a Local 560 membership meeting in opposition to a Provenzano Group proposal—even more critically, a proposal to move a Provenzano Group associate into the position of Business Agent. Almost immediately after the murder took place, Thomas Reynolds, Sr. was arrested and held for a number of weeks as a "material witness." This prompted widespread speculation among the membership that Glockner's murder had been the direct result of, and was in retaliation for, his outspoken criticism at the meeting.

One can have a grave suspicion that Glockner's death was caused by the Provenzano Group. As I have previously found, however, the record will not support a finding to that effect, even by a preponderance of the evidence. But it is clear from a review of the entire record that Glockner's violent demise has been used by the Provenzano Group either directly or subtly as a mechanism of intimidation. For example, it is apparent from the testimony of August Muller that two decades later the members of the Local still have a perception that the Group annihilated Glockner. Even if they did not, this perception has been exploited by the defendants as a means of instilling fear and stifling opposition.

The degree to which perceptions linger that the Glockner murder was an act of retaliation by the Provenzano Group and the dramatic effect that such a perception can have at the present time is illustrated by the August Muller incident, which developed during the course of the trial in this matter.

August Muller has been a member of Local 560 and an employee of Maislin Brothers, a trucking company, for some 23 years. Some months prior to March 23, 1983, Muller had heard Salvatore Provenzano make a statement at a general membership meeting that Maislin Brothers would soon be out of business because the International Brotherhood of Teamsters would insist that Maislin repay certain money which Teamster employees had loaned the company. At approximately 8:00 a.m. on the morning of March 23, 1983, Business

Agent Stanley Jaronko visited the Maislin terminal in his official capacity and convened a meeting in the drivers' room. During the course of this meeting, Muller challenged Jaronko with respect to Salvatore Provenzano's position on the loan as well as his prediction regarding Maislin's survival. The exchange became more and more heated until Jaronko (who is 6' 2" tall and weighs 303 pounds) struck the 58-year old Muller (who is 5' 10", weighs about 195 pounds and has a heart condition), sending him into a wall. Approximately eighty or one hundred men and drivers were present during this incident.

Muller, upon being struck by Jaronko, immediately recalled the shooting death of Walter Glockner. He testified that the Glockner murder had always been a subject of conversation among Teamsters over the years.

After the assault, Muller worked a few hours but was too upset to continue working. He went home and took off the following two days. While off from work, Muller went to this doctor, who discovered an elevated blood pressure and bruises on Muller's chest.

While off from work, Muller also tried to get assurances from Local 560 that there would be no physical reprisals against him. When Muller did not receive any such assurances, he went to the offices of the United States Department of Justice to report the Jaronko incident. His purpose for doing so was, he testified, to make a record should he later be physically harmed by the Teamsters.

After returning to work, Muller and Jaronko had a private meeting at which time apologies were exchanged and Jaronko offered to pay Muller for the three days Muller had been out of work. Muller then felt more secure.

Muller was later compelled to testify about the incident at the trial in this matter. He protested vehemently at being forced to testify about his previous report to the government. Throughout his direct and cross-examination, Muller's demeanor evinced the precise attributes of a man in the grip of extreme fear or even sheer terror because of what he was being compelled to say publicly.

The perception which initially flowed from the Castellitto "disappearance" and the Glockner murder gradually developed into a pervasive climate of intimidation within Local 560. An important factor in the process of generating and maintaining this climate of intimidation has been the systematic appointment and reappointment of associates of the Provenzano Group, particularly of those associates who had serious and extended criminal records or whose propensity for violence or criminal activity was otherwise known to those who were principally responsible for the particular appointment as well as the membership. These appointments included:

"(a) During September of 1961, Anthony Provenzano and the other members of the Local 560 Executive Board (which then included Salvatore Provenzano) appointed Salvatore Briguglio to the position of Business Agent—notwithstanding the fact that Anthony Provenzano then knew that Salvatore Briguglio had murdered Anthony Castellitto, and notwithstanding the fact that rumors to that effect were circulating among the membership at that time.

"(b) On or about February 1, 1963, Anthony Provenzano and the other Executive Board members (including Salvatore Provenzano) appointed Nunzio Provenzano to the position of Business Agent—notwithstanding the fact that three days earlier, on January 29, 1963, Nunzio Provenzano had been convicted (together with Salvatore Briguglio) of an offense involving a payoff demand.

"(c) In 1964, Anthony Provenzano and the other Executive Board members (including Salvatore Provenzano) appointed Robert A. Luizzi to the position of Business Agent—notwithstanding the fact that Luizzi had been convicted in 1945 of a felonious assault and battery and in 1949 of felonious breaking and entry, and had been arrested on four separate occasions thereafter in Hudson County of Disorderly Person,

Aggravated Assault, Deadly Weapon and Aiding and Abetting a Robbery.[23]

"(d) On or about May 15, 1967, Salvatore Provenzano and the other Executive Board members appointed Robert A. Luizzi to the position of Trustee—notwithstanding his criminal record as outlined in (c) above.

"(e) On or about April 25, 1969, Salvatore Provenzano and J.W. Dildine and the other members of the Local 560 Executive Board appointed Salvatore Briguglio to the position of Business Agent—notwithstanding the fact that Salvatore Briguglio had just completed the term of imprisonment for his 1963 conviction in New York State.

"(f) On or about April 25, 1969, Salvatore Provenzano, J.W. Dildine and the other Executive Board members appointed Nunzio Provenzano to the position of "clerk" at the uniquely high salary of some $18,000 per year—notwithstanding the fact that Nunzio Provenzano had just completed the term of imprisonment for his 1963 conviction in New York State, and was forbidden by the terms of his parole from being an officer in the union.

"(g) In 1970, Salvatore Provenzano, J.W. Dildine and the other Executive Board members appointed Thomas Reynolds, Sr. to the position of Business Agent—notwithstanding the fact that Thomas Reynolds, Sr. had pled guilty in 1948 to misdemeanor assault (having been charged with felonious assault), had been convicted in 1958 of felony robbery and had been arrested on five separate occasions for rape (1948), grand larceny (1952), rape (1961), armed robbery (1961), and as a material witness (and, in the minds of some, suspect) in the murder of Walter Glockner (1963).

"(i) In 1970, Salvatore Provenzano, J.W. Dildine and other members of the Local 560 Executive Board appointed Nunzio Provenzano to the position of Trustee of the Trucking Employees of Passaic and Bergen Counties Pension and Welfare Funds—notwithstanding the fact of his previous conviction and incarceration in New York State.

"(j) In 1972, Salvatore Provenzano, J.W. Dildine and the other Executive Board members appointed Salvatore Briguglio to the position of Trustee of the Trucking Employees of Passaic and Bergen Counties Pension and Welfare Funds—notwithstanding the fact of his previous conviction and incarceration in New York State, and notwithstanding the fact that pervasive rumors had linked him to the "disappearance" of Anthony Castellitto.

"(k) On or about January 25, 1973, Salvatore Provenzano, J.W. Dildine and the other Executive Board members appointed Nunzio Provenzano to the position of Secretary-Treasurer—notwithstanding his prior conviction and incarceration.

"(l) On or about September 12, 1975, Salvatore Provenzano, J.W. Dildine and the other members of the Executive Board appointed Thomas Reynolds, Sr. to the position of Trustee of the Trucking Employees of Passaic and Bergen Counties Pension and Welfare Funds—notwithstanding his criminal record and rumored involvement in the Glockner murder.

"(m) In February 1974, Salvatore Provenzano, Nunzio Provenzano, J.W. Dildine and the other members of the Local 560 Executive Board reappointed Salvatore Briguglio to the position of Business Agent—notwithstanding the fact that Salvatore Briguglio had just completed a term of imprisonment on a federal counterfeiting conviction.

"(n) On or about March 12, 1974, Salvatore Provenzano, Nunzio Provenzano, J.W. Dildine and the other members of the Local 560 Executive Board appointed Robert A. Luizzi to the position of Trustee of the Trucking Employees of Passaic and Bergen Counties Welfare and Pension Funds—notwithstanding his criminal record as outlined above.

"(o) On or about November 24, 1975, Salvatore Provenzano, J.W. Dildine and the

---

**23.** While there is no direct evidence in the record which discloses that the membership was aware of Luizzi's past record, I do find some circumstantial evidence of it.

other Executive Board members appointed Anthony Provenzano and Nunzio Provenzano to the positions of Secretary-Treasurer and President, respectively—notwithstanding the fact that Anthony Provenzano had been convicted of labor racketeering and Nunzio Provenzano had been convicted of a felony involving a payoff demand.

"(p) On or about February 9, 1977, Anthony Provenzano, Salvatore Provenzano, Nunzio Provenzano, J.W. Dildine and the other members of the Executive Board appointed Thomas Reynolds, Sr. to the position of Trustee of Local 560—notwithstanding his criminal record and his rumored involvement in the Glockner murder.

"(q) In 1981, Nunzio Provenzano, Salvatore Provenzano, Joseph Sheridan, Josephine Provenzano, J.W. Dildine, Thomas Reynolds, Sr., Stanley Jaronko and Michael Sciarra, as members of the Executive Board of Local 560, appointed Robert A. Luizzi to the position of Business Agent—notwithstanding the fact that Luizzi had a criminal record involving crimes of violence, and notwithstanding the fact that Luizzi had been identified in sworn testimony as having solicited labor peace payoffs or bribes from Helms Express, a trucking company then under contract with Local 560.

This pattern of appointments and reappointments following convictions and incarceration, as well as the related pattern of criminal offenses committed while in office, is, according to testimony I deem credible, unique to Local 560 and unparalleled in the history of United States labor organizations. I find it to be a shameful horror story, the effect of which has been the extortion of the membership's LMRDA-created property rights to union democracy, and the creation, as a result, of a Provenzano Group "fiefdom" within Local 560.

Another factor in the process of generating and maintaining the climate of intimidation within the membership of Local 560 has been the conspicuous and studied indifference of the Provenzano Group, and particularly of its associates who held officer positions in Local 560, to the frequent presence of known or reputed criminals and "undesirables" around the Local's offices. The fact of this presence tended to foster a perception among the membership that the incumbent officers and the Provenzano Group had available to them the support and resources of persons who were not adverse to the use of criminal methods in attaining their desired results. These visitors included:

(a) Thomas Andretta, the brother of Business Agent Stephen Andretta, who had been convicted of the use of extortionate means in the collection of debt in Middlesex County in 1967 (indicted together with Armand Faugno), the theft of Skil Tools from the Canny terminal during 1968 (convicted together with Frederick Salvatore Furino), and counterfeiting during 1971 (convicted along with Salvatore Briguglio, Armand Faugno and three others). In addition, Thomas Andretta had been convicted in or around 1960 for theft from Interstate Shipment. Notwithstanding these convictions, Thomas Andretta was a frequent visitor at the office of Local 560 during the late 1960's and early 1970's.

(b) Armand Faugno had been convicted in 1967 with Thomas Andretta in the Middlesex County Loansharking Transaction and with various other in the 1971 Counterfeiting case. In spite of this record, Faugno sometimes visited the offices of Local 560 before his disappearance in December of 1972. While there is no evidence introduced at trial that Faugno was known to any rank and file member of Local 560 who might have been visiting the office at the same time, word of his relationships with Provenzano Group associates most certainly spread among certain segments of the membership following his disappearance while under indictment together with Thomas Andretta and Salvatore Briguglio.

Another factor in the process of generating and maintaining the climate of intimidation within Local 560 has been the calculated refusal of the Provenzano Group incum-

bants (as well as the other members of the Executive Board) to take such steps and measures as are reasonably and logically necessary to counter adverse perceptions.

Specifically, there is widespread public perception that Local 560 and its leadership is "racket ridden." Within the union, there has long been a perception that certain current and former Executive Board members and business agents have a widespread and continuing reputation for the use of physical violence and economic retaliation against those who oppose them. These members include Anthony Provenzano, Salvatore Provenzano, Nunzio Provenzano, Thomas Reynolds, Sr., Stanley Jaronko, Salvatore Briguglio, and Andrew Reynolds. The testimony of Special Agent Wren in this regard, which I find credible and probative as to the state of mind of the membership, is, I find, merely the "tip of the iceberg." Additionally, Anthony Provenzano, Nunzio Provenzano, and Salvatore Briguglio have long been publicly reputed to be members of the "Genovese Crime Family." Andrew Reynolds has also had contact with reputed members of this larger criminal organization. Neither the Executive Board nor the Provenzano Group have done anything to counter these perceptions. Instead:

—Notwithstanding these perceptions, the Executive Board of Local 560 appointed Anthony Provenzano to the position of Secretary-Treasurer in November of 1975.

—Notwithstanding these perceptions, on July 5, 1978, the Executive Board appointed Anthony Provenzano's daughter Josephine Provenzano to fill the position of Secretary-Treasurer for the unexpired term of her father as his surrogate, upon the latter's conviction in Ulster County, New York, for the 1961 murder of Anthony Castellitto.

—Notwithstanding these perceptions, following the labor racketeering conviction of Nunzio Provenzano during May of 1981, the Executive Board (then including Salvatore Provenzano, Josephine Provenzano, J.W. Dildine, Sr. and Stanley Jaronko) took no action to remove him

from the position of President. This was so despite the fact that his federal conviction in the "City-man" case involved a direct, protracted and egregious breach of trust vis-a-vis the membership of Local 560.

—Notwithstanding such perceptions, in July of 1981—following the resignation of Nunzio Provenzano which had been forced upon him as a condition of bail—the Executive Board appointed Salvatore Provenzano to the position of President. This appointment was made despite the fact that Salvatore Provenzano had held the position of President between May of 1966 and November of 1975, during part of which period Anthony Provenzano and Nunzio Provenzano had committed separate labor racketeering violations involving Local 560, namely the "Seatrain" and "City-man" cases respectively.

Thus, not only had the Executive Board failed to take any steps to counter such adverse perceptions, its actions can only be said to reinforce them, confirming the membership's worst fears.

The pervasiveness of the climate of intimidation within Local 560 and the intensity of its impact upon the membership's ability or willingness to exercise their "union democracy" rights under the LMRDA are evinced by the complete absence of publicly voiced opposition to, disagreement with or critical discussion of the (non-contract related) policies, proposals, decisions and actions of the Provenzano Group incumbents. According to the testimony of Professor Clyde Summers, which testimony I credit, the true test of union democracy is whether the members feel free to openly criticize the policies and practices of the incumbents, and not merely whether there are any opposition candidates. There have been a large number of occasions in the recent history of Local 560 during which an objective observer might have expected to hear such criticism or discussion at membership meetings. For example, the murder of Walter Glockner on the morning after his public display of opposition at a union meeting, and the subsequent arrest

and detention (for several weeks) of Thomas Reynolds as a material witness in the murder, should have been "fodder" for the opposition in 1963 and should still be "fodder" today, particularly in light of the Local's history. The evidence suggests that the question of Glockner's murder has never been raised at a membership meeting, at least not since 1965.

Further, Professor Summers also testified that the conviction of an official on a union-related offense will normally trigger criticism or even encourage the opposition to come forth and make a challenge. The failure of an Executive Board to take any remedial action when a responsible official is indicted or convicted can only add fuel to such a situation. Professor Summers noted that it would matter little that such an offense related to a union other than the one in which the defendant was an official (such as was true in the Braun Payoff Demand case). To have appointed persons who are prepared to raid a union is "to bring foxes into the henhouse." Consequently, anyone who is appointed by a person who was himself sent to jail for selling labor peace should normally be a target of criticism. There has, of course, been no such criticism within Local 560 since the emergence of the Provenzano Group.

The payment by the Executive Board of the accrued salary increases to Anthony Provenzano while he was incarcerated for the murder of Anthony Castellitto (1969–1979) is another example of conduct which Professor Summers identified as of the type which normally would raise protests and opposition. Another is the appointment of Josephine Provenzano to the office of Secretary-Treasurer. The complete absence of such criticism is an indication that the members of Local 560 do not have a feeling of freedom in their ability to exercise their rights. Given the issues which should have triggered dissent and opposition, the history of Local 560 is, according to Professor Summers, unparalleled for its

absence of both contested elections and other criticism or opposition. This "silence" has been both demeaning and damning. The situation is incomprehensible without the explanation that the members are too much in fear to raise their voices.

This is not to deny the fact that some members of Local 560 are content and may even earnestly support the Provenzano Group and its control over the Local. It is equally clear that there are many members who remain apathetic much of the time. There are also, however, dissatisfied members at any given point in time. Notwithstanding the existence of these dissatisfied members there has not been any publicly voiced opposition or dissent within Local 560 since the 1965 election. The absence of even so much as a "peep" in the face of the history outlined herein leads me to find that a significant number of Local 560 members are in fear of the Provenzano Group, that they are in fear for their jobs and their physical safety, and that through this fear the members were induced by the Provenzano Group, aided and abetted by the other individual defendants herein, to part with their LMRDA-created union democracy rights.

I do not base these findings on (nor can I be critical of) the average attendance or turnout at the Local's membership meetings. As the evidence discloses, this average turnout is generally within the pattern experienced by the labor movement as a whole. These meetings are, however, qualitatively different from the average. For example, this court viewed a video tape of a recent Local 560 membership meeting. When it came time for a vote to be taken, the leaders of the Local deliberately turned their backs to the membership, presumably to demonstrate that democracy reigned in the union hall. I find this act to be a superficial manifestation, bordering on the ludicrous and at war with the true state of affairs within the Local.[24]

---

**24.** The process of exercising fundamental democratic rights in opposition to incumbents—such as publicly voicing opposition to their policies or promoting the candidacy of others—may rea-

sonably be expected to engender in the mind of the individual union member a certain degree of apprehension about the potential risks involved: The member may make a fool of him-

## C.

The associates of the Provenzano Group—including today Anthony Provenzano, Nunzio Provenzano, Stephen Andretta, Thomas Andretta, Gabriel Briguglio and Andrew Reynolds—have conspired to participate in the conduct of the affairs of the Provenzano Group Enterprise through a pattern of racketeering activity. Furthermore, these same individuals did also agree together to acquire and maintain control of the Local 560 Enterprise through a pattern of racketeering activity.

The associates of the Provenzano Group well understood its nature, scope and purpose. These individuals knowingly agreed to conduct its affairs through the commission of diverse offenses, including organized gambling, hijacking, extortion, and the infiltration and exploitation of a labor organization through murder, intimidation, fraud and corruption. As described by Salvatore Sinno, the Provenzano Group began its activities as a wholly illicit and criminal enterprise in which each associate accepted orders and assignments from Anthony Provenzano and each was prepared to collaborate with other associates in carrying out particular assignments.

One of these associates was Salvatore Briguglio, who participated in the Castellitto murder at Anthony Provenzano's behest and accepted the reward of union office in return. Another such associate was Nunzio Provenzano, who later participated with Salvatore Briguglio in the Braun Payoff Demand, and with various others in the City-man Labor Peace Payoff. The City-man scheme lasted nine years, and involved the systematic and repeated shakedown of four trucking companies under contract to Local 560. The remaining living members of the Provenzano Group—Stephen and Thomas Andretta and Gabriel Briguglio—

joined Anthony Provenzano in the "labor peace" payoffs from Seatrain Line's carriers, a scheme which lasted for over seven years.

The particular offenses committed by the associates of the Provenzano Group in conducting its affairs and in acquiring and maintaining control over Local 560 were all of a conspiratorial nature and include the following: (1) the hijackings (late 1940's); (2) the Dorn extortion (1952–59); (3) Sinno's gambling operations (1950's–1961); (4) the Castellitto murder (1961); (5) the Braun Payoff Demand (1961); (6) the Middlesex County Loansharking Transaction (1967); (7) the Skil Tool theft (1968); (8) the counterfeiting case (1971); (9) the Romano loan kickback (1974–77); (10) the Woodstock Hotel conspiracy (1974); (11) the Seatrain "Labor Peace" payoffs (1969–77); and (12) the City-man "Labor Peace" payoffs (1971–80). The commission of these offenses indicate that the Provenzano Group has a scope, diversity and viability which transcends that of any single conspiratorial transaction. These offenses have so many points of commonality as to parties, victims, methodology, purpose and duration that no mere coincidence could account for their occurrence. Taken in conjunction with Sinno's description of the takeover of Local 560, these offenses demonstrate that each associate of the Provenzano Group, like Sinno, had a conscious dependence upon the other associates and particularly upon Anthony Provenzano for his own continued well-being.

The commission of these offenses, together with the testimony at trial, also indicate that each of the Provenzano Group associates understood its scope and nature, and knowingly, willingly and even enthusiastically joined the conspiracy. With the exception of Ralph Michael Picardo (1975)

---

self in speaking out publicly. He may lose status with his peers for being critical. He may incur the enmity of the incumbents and sacrifice their support should a job problem arise. There is, however, a point at which the potential for extreme and unjustifiable adverse consequences incidental to the exercise of basic democratic rights becomes so great that the result-

ing apprehensions intensify to a degree which transcends the bounds of what is normal and permissible under ordinary circumstances and assumes the dimensions of wrongful and unjustifiable fear akin to terror. That critical point has been reached with respect to the climate of intimidation within Local 560.

and Salvatore Sinno (1976), no associate of the Provenzano Group has defected and reported the facts of the conspiracy; despite the past and present incarceration of various of its members, not one of the Provenzano Group associates has voluntarily come forward to renounce and withdraw from the conspiracy.

### D.

Local 560 has been, since 1961, and continues to be a captive labor organization, which the Provenzano Group has dominated through fear and intimidation and has exploited through fraud and corruption. The Provenzano Group has used its control over Local 560 to victimize both individual members of the Local and segments of the trucking industry. This victimization has taken the form of multiple violations of 18 U.S.C. § 1962, and these violations are likely to reoccur as long as Local 560 remains a captive labor organization.

Although several key associates of the Provenzano Group are incarcerated, the constellation of facts known about the Provenzano Group, derived from Salvatore Sinno's testimony, from the facts surrounding each of the many prosecutions over the past twenty-two years, and from the other testimony at trial, belie any expectation that it is defunct or even moribund. Given the resilience which it demonstrated during the late 1960's—while three key associates (Anthony Provenzano, Nunzio Provenzano and Salvatore Briguglio) were incarcerated—the facts lead inescapably to the conclusion that various nominees and successors will continue the Provenzano Group's "criminal business" as usual. Yet another generation of extortionists can be expected to be recruited to fill-out the slightly depleted ranks of the Provenzano Group—unless and until the conditions within Local 560 which spawned and nurtured the events of the last twenty-two years are dramatically altered.

This proposition finds support in Sinno's testimony that the Provenzano Group as he knew it had a scope, purpose and methodology which were calculated to ensure its continued viability as a criminal venture. Additionally, the fact that since the formation of the Group over thirty years ago, only Sinno and Picardo have renounced their membership in the conspiracy bespeaks a degree of internal discipline, loyalty and perseverance which is most impressive, particularly given the number of convictions and years of incarceration that have resulted from its activities. Indicative of this discipline and loyalty was the performance of Stephen Andretta during the trial of this matter. Notwithstanding that he was under consideration for parole, he demonstrated no remorse, contrition or rehabilitation on the witness stand, even under a grant of immunity. Instead, he repeatedly and steadfastly denied the predicate facts of each and every essential element of the very offense of which he stands convicted. When confronted with the transcript of the testimony which resulted in his conviction, he pled a total failure of recollection that the testimony in question was ever given, which effectively served to preclude further inquiry. His memory was, in contrast, remarkably clear as to certain other matters, including, for example, remembering the precise day of the week (Tuesday) when the F.B.I. searched his file cabinet at the offices of Local 560 over seven years earlier (on December 2, 1975).

The Muller incident provides further support for the proposition that the pattern of racketeering violations and concomitant misconduct in office will continue. During the pendency of this action, in fact during the trial itself, when the defendants herein would have been presumed to be exercising particular care as to their conduct, Business Agent and Trustee Stanley Jaronko assaulted August Muller, a Local 560 member who had publicly voiced criticism of Salvatore Provenzano. While the exact words spoken by each may be in contention, the salient facts are undisputed that a heated verbal exchange occurred as a result of Muller's criticism, and that Jaronko delivered a blow which nearly drove the victim to his knees. Although Muller re-

covered from the physical trauma within a matter of days, he remained in the grip of terror over the prospect of a Glockner-type retribution—a terror which was manifested during his testimony at trial exactly seven weeks later.

Further, notwithstanding the convictions in the Seatrain and City-man cases—both involving protracted and systematic "labor peace" payoff schemes—the current Executive Board has done nothing whatsoever to devise and implement procedures and safeguards which might reasonably be expected to discourage or detect similar future abuses by employers and employee representatives. In particular, Salvatore Provenzano, who has been the principal officer within Local 560 throughout most of the period since 1966, has systematically and adroitly eschewed every opportunity to learn the particulars of (or at least admitting knowledge of) the government's allegations and the pertinent judicially determined facts of past violations—all of which might easily enable him to devise prophylactic and remedial measures to prevent or minimize the possibility of future racketeering violations involving Local 560. In fact the opposite was the case: he rewarded and encouraged this improper and illegal conduct.[25]

Specifically, when asked on direct examination whether he was familiar with the Dorn case, Salvatore Provenzano replied, "absolutely." On cross-examination, however, he testified that while he was present during Walter Dorn's testimony, he did not hear Dorn testify that Anthony Provenzano and Anthony Castellitto had demanded payoffs. As to the Seatrain trial, Salvatore Provenzano claimed to have attended parts of it and heard Ralph Picardo's testimony—even having reviewed Picardo's testimony in that case. When confronted with a transcript of Picardo's testimony, however, Salvatore Provenzano's recollection could not be refreshed regarding the fact that Picardo had identified Salvatore Provenzano as one of his criminal "associates." In testimony on following day, April 27, 1983, Salvatore Provenzano denied that he had ever reviewed Picardo's testimony in the Seatrain case. Later still, he insisted that he was not very familiar with the facts of the Seatrain case, and stated that he had never taken the time to read the indictment. He also had "never bothered" to have anyone explain the Seatrain indictment to him, and did not believe that it was incumbent upon himself or prudent to do so.

Salvatore Provenzano testified that he had watched the Castellitto murder trial in Ulster County for "quite a few days." He claimed, however, not to know about Anthony Castellitto, Jr.'s testimony that he saw Salvatore Sinno at the Local 560 membership meeting in September of 1961 during which Salvatore Briguglio's appointment as a business agent was announced. Salvatore Provenzano testified as well that he never saw a front page *Star Ledger* article, dated June 2, 1981, which contained admittedly "sensational" facts about Local 560.

Not only have Salvatore Provenzano and the other members of the Local 560 Executive Board members done nothing to devise or implement measures reasonably calculated to prevent and detect potential "labor peace" abuses, they also insist that they believe nothing can be done. This is patently false and clearly unconvincing. The

---

**25.** During the course of the trial, the court raised the question of what internal procedures the union leadership had taken to prevent illegal activity on the part of any representative of the local union. Sam Provenzano testified that he had sleepless nights trying to think of some way to do this. Perhaps he might have taken some guidance from David Dubinsky, who states in his book, *supra* at 117:

I don't think anyone can cure graft completely, but we made a strong effort to. I am proud of what we did.... I had in my desk all the time the undated resignation of every officer just to protect the union if we had trouble of that kind. In the thirty-four years I was president and the two years before that as secretary-treasurer, a total of ninety-three people had to be dismissed from office for taking money from employers.

Any organization can institute internal operating procedures to attempt to weed out corruption and other illegal or improper activity. The record is clear here that no action of this type was ever taken or seriously contemplated.

common denominator in the Seatrain and City-man cases (as well as in other such schemes) is the use of non-union labor in some aspect of the particular company's operation, a particularly egregious form of betrayal of the membership of the union. A reasonably alert business agent or officer should have no difficulty in learning that the members he represents are not working because the company is using non-union labor. Indeed, Salvatore Provenzano's own testimony suggests that the Local often hears rumors from employees or other employers that a particular employer is "cheating" in some way, and is able to follow up with its own investigation.

Finally, the evidence supports a conclusion that Local 560 will remain a captive labor organization as long as the status quo remains unchanged. The current Executive Board members all profess a belief that the convictions of past officials were unjustified. Sheridan, Sciarra and Jaronko each testified that they would reappoint those very same individuals to positions of trust within Local 560 if circumstances permitted.

### III.

In order to prevent future racketeering violations by the Provenzano Group and its aiders and abettors, it is necessary to enjoin Stephen Andretta and Gabriel Briguglio from any future dealings with Local 560 and to remove the current Executive Board members from their positions, appointing in their place one or more trustees to administer the Local during a curative period of appropriate length. Following this period, the trustees would conduct a carefully supervised election to restore union democracy within Local 560.

Stephen Andretta and Gabriel Briguglio, while holding positions of trust within their respective labor organizations, committed serious and protracted labor racketeering violations as associates of the Provenzano Group. If given the opportunity, they are likely to do so again. Stephen Andretta was given an opportunity at trial to make expiation for his conduct, particularly including that involved in the Seatrain Case. Instead, his testimony, which, at best, lacked candor and strained credibility, demonstrated no hint of atonement. Gabriel Briguglio presented no evidence in his defense, and his silence under the circumstances supports an inference that his own evidence would be unfavorable to his cause.

The current Executive Board members must be removed as a predicate to the restoration of union democracy within Local 560 and to ameliorate and remedy the conditions which have enabled the associates of the Provenzano Group to dominate and exploit the Local for the past thirty years. The evidence clearly points to the fact that the members view the leadership of the Local as a single, monolithic control organization. So long as it, or any portion of it, remains in actual control of Local 560, Professor Summers' testimony indicates that it will be very difficult to remove the sense of fear which the members now experience. This sense of fear within the Local—causing members to believe that it is not safe to protest or organize—is so overwhelming that it is not likely to correct itself in the foreseeable future.

Removal of each Executive Board member is also necessary because each one is either unwilling or unable to evaluate objectively the criminal conduct of fellow officers or business agents, or to institute prophylactic measures to ensure as much as possible that past criminal conduct will not be repeated. Moreover, the pervasive attitude of arrogance and insolence in the face of these circumstances continues to impress upon the membership that the Local's leadership at the very least condones criminal conduct. This, too, serves to perpetuate the atmosphere of intimidation and to suppress any dissent.

Salvatore Provenzano must be removed from office for the following reasons:

(1) Salvatore Provenzano has been the chief executive officer of Local 560 for most of the period since 1966—a period marked by the Seatrain and City-man schemes, the Woodstock Hotel Conspiracy,

the counterfeiting case, and other crimes. Yet he claims to believe that those adjudged to have been guilty of those crimes were in fact innocent, and to believe as well that the members of Local 560 to this day "do not believe the damn verdicts at all."

(2) Salvatore Provenzano has maintained that Anthony Provenzano was "framed" in the Dorn Extortion Case in that the conviction was the result of a vendetta started by Robert Kennedy against Anthony Provenzano and the Presiding Judge allowed himself to be importuned in order to facilitate that vendetta against Local 560.

(3) Salvatore Provenzano has maintained that the conduct which led to Anthony Provenzano's indictment in the Eastern Freightways Case was not criminal in nature, but that Anthony Provenzano simply acted foolishly or stupidly.

(4) Salvatore Provenzano has maintained that his brother Anthony was foolish in using Harold "K.O." Konigsberg's Club Cabana as the polling place for the 1962 election, when Anthony Provenzano had earlier evicted Konigsberg from the Local 560 building because the police had described Konigsberg as a "shady character."

(5) Salvatore Provenzano has maintained that the conviction of Anthony Provenzano in the Woodstock Hotel Case was improperly obtained, and that Anthony Provenzano's conduct in that matter was simply "stupid", not criminal.

(6) Salvatore Provenzano has maintained that Anthony Provenzano's conduct in purchasing the Romano property at 531 Palm Drive was not criminal, just "stupid."

(7) Salvatore Provenzano has maintained that, while he was upset at the prospect of his brother Anthony engaging in a second real estate transaction with Thomas Romano (643 Palm Drive), he did not question his brother about this nor was he "worried about it"—notwithstanding his knowledge that there was an investigation underway of the Romano Loans, that the Romanos were then in default and that Anthony Provenzano then held a position of trust within Local 560.

(8) Salvatore Provenzano has maintained that Ralph Picardo (the main prosecution witness in the Seatrain Case) lied. Specifically, Salvatore Provenzano explains his brother's conduct in that case by asserting that Anthony had "innocently" accepted the offer (made by Salvatore Briguglio) to pay for his horse farm's expenses. He suggests that Salvatore Briguglio was, in turn, merely "foolish" in allowing Ralph Picardo (a trucking company owner) to actually pay the bills.

(9) Salvatore Provenzano has maintained that he never "had no reason" to talk to Ralph Pellecchia about the allegations in the Seatrain Case after Ralph Pellecchia had pleaded guilty to the related tax charges (before the other defendants went to trial)—notwithstanding the fact that he had known Pellecchia for many years and that such an inquiry might have provided him with valuable insights into the problem of labor racketeering associated with Local 560 or, at the very least, been helpful in understanding his brother Anthony's situation.

(10) Salvatore Provenzano has maintained that the conviction of his brother Anthony in the Castellitto Murder Case resulted not from the fact that he committed the crime, but from the fact that he had brought a Jewish lawyer into Ulster County and the jury did not pay attention to what was said.

(11) Salvatore Provenzano has maintained that the conviction of Nunzio Provenzano and Salvatore Briguglio in the Braun Payoff Demand (1961) was "unjust" and that they were only guilty of "stupidity."

(12) Salvatore Provenzano has maintained that Nunzio Provenzano was "totally innocent" of the charges which led to his conviction in the 1981 City-man Case, and that he was only guilty of stupidity in allowing Cotler to accompany Millington to a meeting.

(13) Salvatore Provenzano has expressed the belief that Salvatore Briguglio was innocent of the 1971 Counterfeiting charges

and that he entered a guilty plea as a result of a lot of pressure and the possibility of a long prison term should he have been convicted in a jury trial.

(14) Salvatore Provenzano has admitted that he appointed Salvatore Briguglio to the position of business agent despite convictions in the Braun and Counterfeiting Cases because he did not believe that Salvatore Briguglio was guilty of those crimes, the crimes had nothing to do with Local 560 and he still regarded Salvatore Briguglio as "trustworthy."

(15) Salvatore Provenzano has admitted that, when Salvatore Briguglio resigned as a Trustee of the P & B Fund immediately after the effective date of the ERISA Statute, citing that legislation as his reason, he never questioned Briguglio about the meaning or implications of this statement and he continued to regard Briguglio as a trustworthy person for the position of business agent in the Local.

(16) Salvatore Provenzano has admitted that he never gave "much thought" to the fact that F.B.I. Agents recovered ammunition from Salvatore Briguglio's file cabinet during the search for guns at the union office on December 2, 1975, even though Briguglio was then a twice-convicted felon and had been told at the time of reappointment to "keep his nose clean." Moreover, Salvatore Provenzano admitted that, if he had then begun to think that Briguglio's activities might be causing the union a problem, he kept such thoughts to himself.

(17) As noted previously, early in his testimony, Salvatore Provenzano maintained that, although he had lain awake nights and "thought and thought" about what procedures the union could adopt in order to prevent "labor peace" payoffs, he could not "possibly conceive [of the Executive Board] doing anything to stop it."

(18) Yet, in seeming contradiction to this rather dispositive revelation, Salvatore Provenzano would now have this Court believe that his judgment has matured over the years and that were he confronted today with the question of reappointing a person like Salvatore Briguglio (who had two felo-ny convictions), he would not do it because, even though he might personally regard the person as trustworthy, he can now foresee the potentiality for problems, and that this would outweigh other considerations in his thinking. This declaration at trial appears to be inconsistent with his earlier stated position that the criminal past of a potential appointee would not deter him from making that person a business agent.

(19) The shallowness of his conviction on this point is demonstrated by the fact that, when pressed on the issue of whether ordinary common sense (not laws or regulations) would or should have prompted him in 1974 to reject Briguglio after the Counterfeiting sentence, Salvatore Provenzano evaded the question and retreated into a diatribe about the innocence of those convicted and the injustice of the convictions.

(20) Similarly, when pressed to consider in retrospect whether it might not have been prudent in December of 1975 to tell Salvatore Briguglio that his activities were causing the union a problem—in view of the known facts about the reason for and the results of the F.B.I. search—Salvatore Provenzano maintained that it was not Briguglio who had caused the problem, it was Ralph Picardo.

(21) The disingenuousness of Salvatore Provenzano's assertion that "things will be different" is made manifest by his candid admission at trial that he never thought of what he would do if a business agent came to him and reported that an employer had made a Taft-Hartley bribe offer—notwithstanding the fact that such payments were the gravamen of the Dorn, Seatrain and City-man prosecutions.

(22) Contrary to his recent assertions, Salvatore Provenzano has no real interest in establishing the conditions which allow union democracy to emerge within Local 560, or even in learning the facts which might enable him to do things differently. When confronted with the "sensational" front page *Star Ledger* article, for example, he let slip the fact that he has become

"so immune [to such allegations that] it is not even funny."

(23) It is clear that Salvatore Provenzano never lifted a finger to thwart the effort of his brothers while they were arrogantly and corruptly victimizing the union. It is abundantly apparent that "Tony Pro" ran this union for many years with the approbation and connivance of Salvatore. When faced with the choice of protecting the membership or Tony, Sam had no trouble making a decision: his brother came first. This court can have no confidence in his recent change of mind and attitude.

J.W. Dildine must be removed from office for the following reasons:

(1) J.W. Dildine has participated in and bears responsibility for the series of appointments of Local 560 business agents and officers (to fill vacancies) since the mid-1960's which resulted in the current configuration of leadership within Local 560.

(2) J.W. Dildine believes that the union's problems have solely been the result of a vendetta by the Government against the officers of Local 560. Assuming his professed belief to be in earnest, such a belief held in the face of the record of convictions in Local 560 demonstrates a profound lack of objectivity, without which meaningful change within Local 560 will be impossible and fresh racketeering violations by the Provenzano Group and its aiders and abettors will be likely. If his statement of belief is not in earnest, his complicity in the actions of the Provenzano Group is even clearer.

(3) J.W. Dildine is intensely loyal to Anthony and Nunzio Provenzano. He respects them a "great deal" and cannot believe in the validity of their convictions.

(4) J.W. Dildine has endorsed the payments by Local 560 of accrued salary and pension benefits to Anthony Provenzano— notwithstanding the fact that he has twice been convicted of selling out the membership on "bread and butter" issues and that the Local receives no benefit from the expenditure of those assets.

Joseph Sheridan must be removed from office for the following reasons:

(1) Like J.W. Dildine, Joseph Sheridan professes to earnestly believe that Local 560's problems are the product of a government vendetta.

(2) Joseph Sheridan believes that both Anthony and Nunzio Provenzano were convicted of various crimes because of their names.

(3) Joseph Sheridan does not believe in the truth of the allegations which resulted in Nunzio Provenzano's conviction in the Braun case.

(4) Joseph Sheridan is unable or unwilling to institute controls or safeguards to ensure that Local 560 is not victimized in the future by criminal conduct such as that which occurred in the Seatrain and Cityman cases.

(5) Joseph Sheridan does not consider Anthony and Nunzio Provenzano to be anything but good labor leaders.

(6) If Nunzio Provenzano were eligible to serve on the Executive Board tomorrow, Joseph Sheridan, as a trustee and Vice-President of Local 560, would welcome him back with "open arms".

(7) Joseph Sheridan's mind-set, after all that has occurred over the past thirty years, would make it impossible for him to formulate and promote policies which would be reasonably calculated to prevent or discourage further racketeering activity within Local 560 and ameliorate the current climate of intimidation. As previously noted, his loyalty has been purchased.

Josephine Provenzano must be removed from office for the following reasons:

(1) At the time of her appointment to the position of Secretary-Treasurer of Local 560, Josephine Provenzano had none of the usual qualifications required of the office, possessing only some limited general bookkeeping skills.

(2) As the defendants admit, Josephine Provenzano's "major qualification" is the fact that she is Anthony Provenzano's daughter.

(3) Josephine Provenzano has yet to assume the duties of a business agent, despite the fact that previous Secretary-Treasurers have assumed such responsibility.

(4) These facts reflect her true status as a mere nominee for her incarcerated father.

(5) In the course of her tenure as Secretary-Treasurer, she has demonstrated none of the independence that would enable her to in any measure counteract the impacted problems of the past and prevent a recurrence of racketeering violations by the Provenzano Group.

Michael Sciarra must be removed from office for the following reasons:

(1) Michael Sciarra does not believe that Anthony Provenzano committed any of the offenses for which he has been convicted.

(2) Michael Sciarra does not believe in the guilt of Nunzio Provenzano in either the Braun or City-man Cases.

(3) Michael Sciarra does not believe that Salvatore Briguglio was guilty of the charges in the Braun Case.

(4) Michael Sciarra has admitted that he could see no reason not to bring Nunzio Provenzano back to the Executive Board, if the government and the law permitted it. He would adhere to this position even if he knew for a fact that Nunzio Provenzano had committed the crimes of which he has been convicted.

(5) Michael Sciarra has maintained that he cannot think of any controls which could be instituted to prevent future criminal conduct should Nunzio Provenzano return to the union.

(6) Michael Sciarra would welcome back Stephen Andretta even if he knew for a fact that the Seatrain charges against Andretta were true.

(7) Michael Sciarra would "pray" for the return of Anthony Provenzano to Local 560 even if he was convinced that the Castellitto Murder charges were true.

(8) His inactivity as Business Agent to protect the collective bargaining rights of the membership at Canny Trucking was causally related to his close relationship to Frederick Salvatore Furino. This directly contradicts his profession of love for the members of Local 560.

(9) The foregoing demonstrates that Michael Sciarra has an involvement with the Provenzano Group, as well as a mind-set, which makes it impossible for him to analyze objectively what must be done within Local 560 to avoid a repetition of the past and to ameliorate the climate of intimidation within Local 560.

Stanley Jaronko must also be removed from office for the following reasons:

(1) Stanley Jaronko's feelings of loyalty towards the Provenzanos are so intense and his impulse control is so limited that, in the very midst of this lawsuit, he could not restrain himself from striking a Local 560 member who publicly voiced criticism of Salvatore's pronouncements.

(2) Stanley Jaronko has maintained that Anthony Provenzano is not guilty of the murder of Anthony Castellitto.

(3) Stanley Jaronko has admitted that he cannot accept the convictions of Anthony Provenzano and Stephen Andretta in the Seatrain Case.

(4) Stanley Jaronko has admitted that he does not believe in the guilt of Nunzio Provenzano in the City-man or the Braun Cases.

(5) Stanley Jaronko has maintained that it would not be important for him to find out the details surrounding the conviction of a Local 560 officer for having accepted "labor peace" payoffs.

(6) Stanley Jaronko testified that, since neither Nunzio and Anthony Provenzano have ever done anything illegal, it would not be necessary to institute safeguards to insure that, should they return as officials of Local 560, they would not be able to use their positions for criminal purposes.

(7) Stanley Jaronko would take back Nunzio and Anthony Provenzano tomorrow as Local 560 officials, if it were possible.

(8) The foregoing demonstrates that Stanley Jaronko identifies himself closely

with Provenzanos' thirty-year history of racketeering activity within Local 560, and is steadfastly opposed to any change in the status quo.

Thomas Reynolds, Sr. must also be removed from office for the following reasons:

(1) Thomas Reynolds incorrectly believes that Helms Express does not have a special commodities division, and that he has never negotiated with William Bender concerning the operation of a special commodities division within Local 560's jurisdiction.

(2) Thomas Reynolds admits knowing what a guaranteed list is, but insists that he has never negotiated such a list for any of his barns. He specifically had no recollection of having negotiated a guaranteed list for any of his Helms Express Barns. The true facts are to the contrary.

(3) Thomas Reynolds has maintained that none of the barns which he has represented—including Helms and P.I.E.—has ever had a special commodities or iron and steel division. This is totally incorrect.

(4) As the Business Agent for Helms Express and P.I.E., Thomas Reynolds did not question Nunzio Provenzano, Salvatore Provenzano or Michael Sciarra about the allegations contained in the 1980 City-man Indictment, which involved the illegal operation of special commodities divisions by those companies while Reynolds represented their employees. His failure to "see any reason" to do so typifies the studied indifference with which the officials of the Provenzano Regime have regarded the pattern of racketeering activity over the past two decades.

(5) Thomas Reynolds has maintained that the first time he became aware of the fact that salary increases had been voted for and paid to Anthony Provenzano was upon reading the instant Complaint during his deposition on July 7, 1982.

(6) Thomas Reynolds has testified that he was never a Trustee of the Passaic and Bergen Fund, when in fact the records of the Fund reflect that he was a Trustee from September 23, 1975 through May 4, 1977.

(7) All of these facts demonstrate that Thomas Reynolds has little idea of what is going on within Local 560 or what he is supposed to be doing as an official therein. He is simply being "carried" by the Provenzano Regime, and it is inconceivable that he would take any action which might alter the status quo. While his removal for mere inactivity or complacency would be inappropriate, in the context of this case his role is clearly that of an aider and abettor, facilitating the actions of the Provenzano Group.

Only through the imposition of a trusteeship for a curative period of sufficient length can the pattern of abuse be broken and future violations prevented. Such a trusteeship would serve to effectively dispel the existing atmosphere of intimidation within Local 560, to restore union democracy, and to ensure (to the extent possible) that racketeers do not obtain positions of trust within the Local. To do so, I find it necessary to displace the entire Executive Board so that no adherent of the Provenzano Group will be in a position to potentially undermine the efforts of the trustee or trustees. This curative period would then be followed by a supervised general election of new officers for Local 560. This election will be held at such time as the court, with the recommendation of the trustee(s), determines that sufficient political freedom has been restored within Local 560 to permit the membership to express themselves without fear or apprehension. The curative period shall be no longer than necessary to fulfill this purpose, and shall presumptively be eighteen months in accordance with the Taft-Hartley Act.

Because of the unprecedented nature of this action and remedy, I have determined to stay the enforcement of this injunctive relief pending appeal, pursuant to Rule 62 of the Federal Rules of Civil Procedure.

IV.

A.

Before turning to a consideration of the law applicable to this case, I first must

resolve several threshold matters. First among these is the question of the burden of proof applicable to this action. Defendants suggest that because of the criminal conduct alleged as constituting some of the predicate acts herein, the appropriate burden is the highly stringent "beyond a reasonable doubt" standard, or alternatively the intermediate standard of "clear and convincing" evidence. The government responds that, given the nature of the relief sought and the fact that this is a civil action, the "preponderance of the evidence" standard should be applied.

The Supreme Court has recently noted that " '[t]he function of a standard of proof, as that concept is embodied in the Due Process Clause and in the realm of factfinding, is to instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication.' " *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 1395, 71 L.Ed.2d 599 (1982), quoting *Addington v. Texas*, 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979) and *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) (Harlan, J., concurring). In any given proceeding, the standard of proof applied "reflects not only the weight of the private and public interests affected, but also a societal judgment about how the risk of error should be distributed between the litigants." *Santosky*, 102 S.Ct. at 1395.

At one end of the spectrum of the three burdens of proof established by the Court's opinions in this area is the "preponderance of the evidence" standard. This is the standard applied in the typical civil case, which usually involves private parties seeking money damages. Society has the least concern with the accuracy of the outcome of such private suits, and the litigants share the risk of error in roughly equal fashion. *Addington*, 441 U.S. at 423, 99 S.Ct. at 1807.

At the other end of the spectrum, in a criminal case, the interests of the defendant are of such magnitude that they "have been protected by standards of proof de-

signed to exclude as nearly as possible the likelihood of an erroneous judgment." *Id.* (footnote omitted). As a consequence, society imposes almost the entire risk of error on itself in such cases.

In the middle ground is the intermediate standard, usually known as the "clear and convincing evidence" standard. It is generally used in civil actions involving allegations of fraud or some other quasi-criminal wrongdoing by the defendant, as well as in civil actions initiated by the government that "threaten the individual involved with 'a significant deprivation of liberty' or 'stigma.' " *Santosky*, 102 S.Ct. at 1396, quoting *Addington*, 441 U.S. at 425, 426, 99 S.Ct. at 1808, 1809. *See, e.g. Santosky*, (parental rights termination proceeding); *Addington*, (civil commitment); *Woodby v. INS*, 385 U.S. 276, 285, 87 S.Ct. 483, 487, 17 L.Ed.2d 362 (1966) (deportation); *Chaunt v. United States*, 364 U.S. 350, 353, 81 S.Ct. 147, 149, 5 L.Ed.2d 120 (1960) (denaturalization); *Schneiderman v. United States*, 320 U.S. 118, 125, 159, 63 S.Ct. 1333, 1336, 1353, 87 L.Ed. 1796 (1943) (denaturalization).

Applying these distinctions to the case before me, I find that the "preponderance of the evidence" standard is the appropriate burden of proof to be applied herein. First, the defendants in this action do not face criminal sanctions, and thus there appears to be no basis on which to apply the "beyond a reasonable doubt" standard. Next, the defendants also do not face the risk of a significant deprivation of liberty or stigma as defined by the Supreme Court. While the complaint does allege fraudulent acts and other criminal and quasi-criminal conduct on the part of certain of the defendants, these allegations are only in the context of the RICO statute's requirement that, even in civil RICO actions, the plaintiff plead and prove the existence of a pattern of racketeering activity.

Further, I find that the nature of the relief sought provides an additional key to the burden of proof issue. The relief sought by the government in this action—

that which is authorized by § 1964(a)—is equitable and remedial in nature, not punitive. In these circumstances, I find it appropriate to follow the clear majority of the courts which have considered this issue in applying the "preponderance of the evidence" standard. *See, e.g., United States v. Cappetto,* 502 F.2d 1351, 1358 (7th Cir. 1974), *cert. denied,* 420 U.S. 925, 95 S.Ct. 1121, 43 L.Ed.2d 395 (1975); *Farmers Bank of Delaware v. Bell Mortgage Corp.,* 452 F.Supp. 1278, 1280 (D.Del.1978); *United States v. Winstead,* 421 F.Supp. 295, 296 (N.D.Ill.1976); *Heinold Commodities, Inc. v. McCarty,* 513 F.Supp. 311, 313 (N.D. Ill.1979); *State Farm Fire & Casualty Co. v. Estate of Caton,* 540 F.Supp. 673, 676 (N.D.Ind.1982); *Parnes v. Heinold Commodities, Inc.,* 487 F.Supp. 645, 647 (N.D. Ill.1980).

■ Next, I find that the deposition of Andrew Reynolds is admissible under Rule 801(d)(2)(D) and (E) of the Federal Rules of Evidence. I find further that for these purposes Reynolds was both an agent of Local 560 and a co-conspirator of the Provenzano Group defendants herein. Andrew Reynolds, while a business agent of Local 560, was generally empowered to exercise independent judgment and discretion concerning the contractual affairs of Local 560. He acted free of close supervision concerning these matters. While not authorized to carry out certain functions reserved to the officers of Local 560, such as the formal signing of contracts, it is uncontested that business agents can and do negotiate contracts, organize unorganized jobs and handle grievances on behalf of the members they represent. I thus find that Andrew Reynolds was, during his tenure as Business Agent, a managing agent within the meaning of Fed.R.Civ.P. 32(a)(2). *See Krauss v. Erie R. Co.,* 16 F.R.D. 126, 127 (S.D.N.Y.1954).

Finally, I find that I need not reach the issue of the admissibility of the results of the Galagarza lie detector test. I have, on other grounds, found that Galagarza's testimony at trial was not sufficiently credible to permit a finding (by even a fair prepon-

derance of the evidence) that Thomas Reynolds committed the murder of Walter Glockner.

## IV.

### B.

There have been numerous legislative attempts to control labor racketeering at both the state and federal levels. Federally, these have included the LMRDA, 29 U.S.C. § 411, the Hobbs Act, 18 U.S.C. § 1951, *see, e.g., United States v. Palmiotti,* 254 F.2d 491 (2d Cir.1958), the Taft-Hartley Act, 29 U.S.C. § 186, and various other statutory enactments, such as 29 U.S.C. § 501(c) (prohibiting embezzlement from labor organizations) and 18 U.S.C. § 664 (prohibiting embezzlement from employee benefit plans).

A major stumbling block in prosecutions under each of these statutes has been the difficulty in demonstrating the nature and specific elements of the alleged illegal activity in the context of ongoing syndicated or organized crime. *See* Blakey and Goldstock, " 'On the Waterfront' ": RICO and Labor Racketeering, 17 Am.Crim.L.Rev. 341, 367-47 (1980). As they have noted:

> Labor racketeering is not a single crime; it includes the infiltration, domination, and use of a union for personal benefit, generally by members of various organized criminal groups. Labor racketeering thus comprises both traditional overt physical crime and more sophisticated covert white-collar offenses. The challenge of law enforcement has been to demonstrate that relationship—the invidious nature of white-collar crime when committed by a criminal group as an element of a pattern of racketeering activity.

*Id.* (footnotes omitted). It was in the context of these difficulties of proof that Congress passed the RICO Act.

The Racketeer Influenced and Corrupt Organization Act was enacted primarily, although not exclusively, to halt organized crime's incursion into legitimate organizations. *See id.* at 348 (1980). As the stat-

ute itself states, its purpose was "to seek the eradication of organized crime in the United States by strengthening the legal tools in the evidence-gathering process, by establishing new penal prohibitions, and by providing enhanced sanctions and new remedies to deal with the unlawful activities of those engaged in organized crime. Pub.L. No. 91–452, 84 Stat. 922, 923 (1970).

The effect of RICO is not to make illegal any specific substantive act which was previously legal, since each act punishable under RICO also constitutes a separate offense under state or federal law. Instead, RICO states that if a person commits two or more of these offenses within a ten-year period he or she is guilty of a "pattern of racketeering activity," 18 U.S.C. § 1961(1) and (5), and is therefore subject to additional penalties. RICO requires more, however, and that is proof of a relationship between the "pattern of racketeering activity" and an "enterprise" within the meaning of 18 U.S.C. § 1961(4). Specifically, 18 U.S.C. § 1962(b) requires that the government establish that the defendant "person" acquired or maintained, through a pattern of racketeering activity, an interest in or control of such an enterprise. Section 1962(c) in turn makes it a federal crime for any person employed by or associated with any enterprise to conduct or participate in the conduct of such enterprise's affairs through a pattern of racketeering activity. "Enterprise," according to the statute, "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associates in fact although not a legal entity." 18 U.S.C. § 1961(4).

The Supreme Court has recently held that a completely illegal organization may be an enterprise for RICO purposes. *United States v. Turkette*, 452 U.S. 576, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981); *see also United States v. Riccobene*, 709 F.2d 214 (3d Cir.1983); *United States v. Provenzano*, 620 F.2d 985, 992–93 (3d Cir.), *cert. denied*, 449 U.S. 899, 101 S.Ct. 267, 66 L.Ed.2d 129 (1980). The *Turkette* Court reasoned that it was not inconsistent with RICO's purpose to give effect to the plain language of the statute to punish the activities of illegal organizations—even before any infiltration of legitimate organizations took place. This "preventative" function would, the Court stated, enable federal law enforcement officials "to deal with the problem at its very source." 452 U.S. at 591, 593, 101 S.Ct. at 2532, 2533.

To avoid the dangers potentially associated with such a broad reading of the statute, the *Turkette* Court added three elements necessary to establish the existence of such an enterprise: "evidence of an ongoing organization, formal or informal" and "evidence that the various associates function as a continuing unit." 452 U.S. at 583, 101 S.Ct. at 2528. The enterprise must additionally be shown to have an existence "separate and apart from the pattern of activity in which it engages. *Id.*, see United States v. Riccobene*, 709 F.2d 214, 221 (3d Cir.1983). The Court noted that the proof used to establish the existence of an enterprise "may in particular cases coalesce" with that used to establish the existence of a pattern of racketeering activity, although "proof of one does not necessarily establish the other." 452 U.S. at 583, 101 S.Ct. at 2528.

 RICO additionally requires the showing of "person" as a separate element apart from the "enterprise." While nothing in the statute compels the conclusion that these elements are mutually exclusive, there is also nothing on its face to support the opposite conclusion. *See* Blakey, "The RICO Civil Fraud Action in Context: Reflections on *Bennett v. Berg*," 58 Notre Dame L.Rev. 237, 286–87 (1982). Given Congress' characterization of RICO as "remedial" and its directive that it be "liberally construed," I conclude that the resolution of this issue should depend on the circumstances of each case. In the case before me, I find no incongruity or inconsistency with the statute in the government's characterization of the Provenzano Group (and its associates) as a "person" in some instances, particularly as to § 1962(b), while also characterizing it as an

"enterprise" in others, particularly as to § 1962(c). *But see Bennett v. Berg*, 685 F.2d 1053, 1061 (8th Cir.1982); *Van Schaick v. Church of Scientology*, 535 F.Supp. 1125 (D.Mass.1982). There is, of course, no question that individuals may be charged under RICO as "persons" while being grouped collectively as an "enterprise", under the well-established association in fact doctrine. *E.g., United States v. Turkette*, 452 U.S. 576, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981).

■ Section 1962(d) makes it an offense to conspire to violate section 1962(b) or (c). The Third Circuit has recently held that to establish such an "enterprise" conspiracy, the government must establish both that an enterprise did in fact exist and that the individual defendants knowingly agreed to participate in the "enterprise" through a pattern of racketeering. *United States v. Riccobene*, 709 F.2d 214, 220–21 (3d Cir. 1983). As Judge Adams stated in *Riccobene*:

> An agreement merely to commit the predicate offenses would not be sufficient to support a RICO conspiracy. Nor is it sufficient if the defendants merely participate in the same enterprise .... This is so because, under RICO, it is an agreement 'to conduct or participate ... in the conduct of [an] enterprise's activities' through the commission of predicate offenses that is prohibited, not an agreement to commit a pattern of racketeering activity alone.

*Id.* at 224. Thus it is clear that RICO has more broadly defined the allowable purpose or objective of a conspiratorial agreement under § 1962(d). Conspiracy may be established even where the underlying offenses are apparently unrelated, as long as the defendants have agreed to, for example, participate in the furtherance of an enterprise's affairs by committing those underlying offenses.[26] *Id.*

The circuits have split on the extent and nature of the agreement required under RICO.[27] For example, in *United States v. Phillips*, 664 F.2d 971 (5th Cir.1981), *cert. denied*, 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982), the court stated that "[p]roof of a RICO conspiracy charge requires that the Government prove the additional element of agreement. The defendant must have 'objectively manifested an agreement to participate, directly or indirectly, in the affairs of an enterprise through the commission of two or more predicate crimes.'" *Id.* at 1012, quoting *United States v. Elliott* 571 F.2d 880, 903 (5th Cir.) *cert. denied*, 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978). The *Elliott* court's observation, quoted by Judge Johnson in *Phillips*, is, however, less than clear. Does it, for example, mean that the individual must personally commit two or more offenses, that he agree that someone connected to the enterprise commit two or more offenses, that he agree personally to commit two or more offenses, or that he agree that someone connected to the enterprise commit two or more offenses? *See United States v. Winter*, 663 F.2d 1120, 1136 (1st Cir.1981). *See also United States v. Lemm*, 680 F.2d 1193, 1203 n. 11

---

**26.** I agree with a number of courts and commentators that the concepts of "wheel and spoke" conspiracies, *see Kotteakos v. United States*, 328 U.S. 750, 755, 66 S.Ct. 1239, 1243, 90 L.Ed. 1557 (1946) and "chain" conspiracies, *see Blumenthal v. United States*, 332 U.S. 539, 68 S.Ct. 248, 92 L.Ed. 154 (1947), impede rather than facilitate analysis of the single versus multiple conspiracy issue, particularly in the Enterprise conspiracy context. *See* Note, "Conspiracy to Violate RICO: Expanding Traditional Conspiracy Law," 58 Notre Dame L.Rev. 587, 595 (1983). As former Chief Judge Brown states in *United States v. Perez*, 489 F.2d 51, 59 n. 11 (5th Cir.1973), *cert. denied*, 417 U.S. 945, 94 S.Ct. 3067, 41 L.Ed.2d 664 (1974), "[c]onspiracies are as complex as the versatility of human nature and federal protection against them is not to be

measured by spokes, hubs, wheels, rims, chains, or any one or all of today's galaxy of mechanical molecular or atomic forms." *See also United States v. Elliott*, 571 F.2d 880 (5th Cir.), *cert. denied*, 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978); *United States v. Elam*, 678 F.2d 1234, 1246 (5th Cir.1982).

**27.** All reported RICO conspiracy cases except one, *see United States v. Loften*, 518 F.Supp. 839 (S.D.N.Y.1981), have involved conspiracies to violate section 1962(c), and have had as their object the participation in an enterprise's affairs through a pattern of racketeering activity. *See* Note, Conspiracy to Violate RICO: Expanding Traditional Conspiracy Law, 58 Notre Dame L.Rev. 587, 602 (1983).

(8th Cir.1982). The First Circuit, in *Winter*, joined the Fifth Circuit[28] in requiring proof of an agreement to commit two acts personally by the defendants. The Ninth Circuit, however, in *United States v. Brooklier*, 685 F.2d 1208, 1220–23 (9th Cir.1982) has termed the two personal offense rule an "unnecessary burden." Most recently, the Eleventh Circuit has rejected the two personal offense rule, stating that "[i]t is enough that the defendant agreed to the commission of two predicate acts." *United States v. Carter*, 721 F.2d 1514 at 1531 (11th Cir.1984) (emphasis added). *But see United States v. Kopituk*, 690 F.2d 1289 (11th Cir.1982).

The Third Circuit has not had to squarely face and resolve the issue of the necessity of proof of the commission of two predicate acts personally. *See, e.g., United States v. Dickens*, 695 F.2d 765, 780–81 (3d Cir.1983) (two offense rule noted, but conviction upheld without clear proof of personal participation of one defendant); *United States v. Boffa*, 688 F.2d 919, 934, 937 (3d Cir.1982) (more than two offenses shown; two offense instruction upheld, but not required). *Riccobene* is not, in my judgment, to the contrary. *United States v. Riccobene*, 709 F.2d 214, 224, 227 (3d Cir.1983). Commentators have recently criticized the "two personal offense" rule. After tracing the development of the rule from an evidentiary rule of thumb to a rule of law, one commentator has noted that it is "impossible to square it with general principals of accomplice or conspiratorial responsibility." "Most importantly," he suggested, " ... it is perverse" in its inhibitory effect on the prosecution of the leaders of organized crime groups. Blakey, "The RICO Civil Fraud Action in Context: Reflections on *Bennett v. Berg*," 58 Notre Dame L.Rev. 237, 297 (1982). Specifically, under such a reading of the statute, organized crime leaders could avoid conviction under RICO by "keeping their hands clean." *See also* Note, "Conspiracy to Violate RICO: Ex-

panding Traditional Conspiracy Law," 58 Notre Dame L.Rev. 587, 602–05 (1983).

█ I conclude that the cases dealing with the two personal offense rule involve a confusion between a shorthand statement of what is necessary to violate RICO substantively as a principal in the first degree (two personal offenses), and what may be sufficient to violate RICO substantively as a principal in the second degree or as an accessory before the fact under 18 U.S.C. § 2 (aiding and abetting another to commit two offenses). *See* W. LaFave and A. Scott, *Criminal Law* § 63, p. 495 (1972). *See also United States v. Freeze*, 707 F.2d 132, 136–37 (5th Cir.1983). At common law, too, one who was a co-conspirator, as an independent basis for criminal responsibility, was vicariously and substantively liable for reasonably foreseeable offenses committed in furtherance of the conspiracy. *See, e.g., Pinkerton v. United States*, 328 U.S. 640, 647, 66 S.Ct. 1180, 1184, 90 L.Ed. 1489 (1946) ("[t]he overt act of one partner in crime is attributable to all."). *See also, Ferguson v. Omnimedia, Inc.*, 469 F.2d 194, 197–98 (1st Cir.1972) (conspirator "may be held [civilly] responsible for the acts of a co-conspirator ... even if she herself did not participate in those acts."). I, therefore, conclude that a RICO "Enterprise" conspiracy may be established without personal conduct amounting to two personal predicate offenses. Instead, it is sufficient if the government demonstrates the agreement through the defendant's aiding and abetting in at least two such offenses, or through assent to the commission by someone else or several others of at least two such offenses. *See Bannon v. United States*, 156 U.S. 464, 468–69, 15 S.Ct. 467, 469–70, 39 L.Ed. 494 (1895) ("To require an overt act to be proven against every member of a conspiracy, or a distinct act connecting him with the combination to be alleged, would not only be an innovation upon established principle but would render

**28.** *See, e.g., United States v. Sutherland*, 656 F.2d 1181, 1189 (5th Cir.1981), *cert. denied*, 455 U.S. 949, 102 S.Ct. 1451, 71 L.Ed.2d 663 (1982); *United States v. Welsh*, 656 F.2d 1039, 1057 (5th Cir.1981). *But see United States v. Cauble*, 706 F.2d 1322, 1339 (5th Cir.1983) (agreement to either commit or aid and abet in the commission of the predicate acts sufficient).

most prosecutions for the offense nugatory.").

■ Whether an "overt act" other than a predicate act of racketeering need be proven to establish a violation of § 1962(d) has also occasioned conflicting decisions among the Circuits. The old Fifth Circuit held this to be an element of a RICO Enterprise conspiracy. *See United States v. Sutherland*, 656 F.2d 1181, 1186 n. 4 (5th Cir.1981), *rehearing denied*, 663 F.2d 101 (5th Cir.1982). The Second Circuit in *United States v. Barton*, 647 F.2d 224, 237 (2d Cir.) *cert. denied* 454 U.S. 857, 102 S.Ct. 307, 70 L.Ed.2d 152 (1981), found no such showing to be required. Given that the statute itself contains no overt act requirement,[29] I must conclude that the Second Circuit's position is the better reasoned. *See United States v. Forsythe*, 429 F.Supp. 715 (W.D.Pa.), *reversed on other grounds*, 560 F.2d 1127 (3d Cir.1977).

■ Next, whether some state of mind (such as intent or knowledge) must be demonstrated in a RICO Enterprise conspiracy beyond that required for the commission of the predicate offenses has further split the courts that have considered the issue. The Second and Ninth Circuits have held that no such showing is required under § 1962(d). *United States v. Scotto*, 641 F.2d 47, 55–56 (2d Cir.1980), *cert. denied*, 452 U.S. 961, 101 S.Ct. 3109, 69 L.Ed.2d 971 (1981); *United States v. Baylan*, 620 F.2d 359, 361–62 (2d Cir.1980); *United States v. Rone*, 598 F.2d 564, 571 (9th Cir.), *cert. denied*, 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 780 (1980). "[G]rave doubts as to the propriety of these holdings" were, however, expressed by the Eighth Circuit in *United States v. Bledsoe*, 674 F.2d 647, 661 (8th Cir.1982).. The old Fifth Circuit required proof of a state of mind for the RICO-specific elements, not just the predicate offenses. *See, e.g., United States v. Sutherland*, 656 F.2d 1181, 1191–95 (5th

Cir.1981), *cert. denied*, 455 U.S. 949, 102 S.Ct. 1451, 71 L.Ed.2d 663 (1982); *United States v. Diecidue*, 603 F.2d 535, 553–55 (5th Cir.1979), *cert. denied*, 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 781 (1980). I conclude that proof of a state of mind apart from that required for the commission of the predicate offenses must be demonstrated for each alleged conspirator. *But see United States v. Boffa*, 513 F.Supp. 444 (D.Del.1980), *aff'd in part, rev'd in part*, 688 F.2d 919 (3d Cir.1982).

■ Finally, as to aiding and abetting, the conduct requirement under 18 U.S.C. § 2 is complicity with or facilitation of the criminal conduct of another.[30] In order to convict a defendant of aiding and abetting the commission of a crime, the government must prove two essential elements: (1) that the substantive crime has been committed, and (2) that the defendant charged with aiding and abetting that crime knew of the commission of the substantive offense and acted with intent to facilitate it. *United States v. Dixon*, 658 F.2d 181 (3d Cir.1981); *see also United States v. Reicherter*, 647 F.2d 397 (3d Cir. 1981). The knowledge and volitional act requirements of Dixon's second element have different meanings in various contexts. Here, where the Local's officials were under an affirmative duty to act on behalf of the membership, a defendant's deliberate refusal either to act or to investigate (*i.e.*, the conscious avoidance of knowledge)—while knowing the consequences of such inaction—can satisfy this element, so long as that defendant had some interest in the successful accomplishment of the crime being committed. *See Moss v. Morgan Stanley, Inc.*, 553 F.Supp. 1347 (S.D.N.Y. 1983). These elements of aiding and abetting may, of course, be proved by circumstantial as well as direct evidence. *United*

---

**29.** S.Rep. 91–617, 91st Cong. 1st Sess. 159 (1969) cites *Singer v. United States*, 323 U.S. 338, 340, 65 S.Ct. 282, 283, 89 L.Ed. 285 (1945), which stands for the proposition that where no overt act requirement is set forth in the statute, none is required.

**30.** I note that while this is a civil RICO action, the substantive theory which is applicable is nonetheless criminal—both as to aiding and abetting and as to conspiracy.

*States v. Smith*, 700 F.2d 627 (11th Cir. 1983).

The kinds of conduct which can constitute aiding and abetting are many and varied. Former Chief Judge Hastie, in *United States v. Barber*, 429 F.2d 1394, 1397 n. 4 (3d Cir.1970), listed several which have applicability to this case:

.. [T]he fact that an individual has served as a lookout during the commission of a crime is a clear indication of participation in the wrongdoing. *Long v. United States*, (D.C.Cir. [1966]), 360 F.2d 829. Verbal encouragement of an assault has been held sufficient evidence of complicity in the wrongdoing. *Kuney v. Dutcher*, 1885, 56 Mich. 308, 22 N.W. 866. Those who make no assault but undertake to intimidate the victim and block his escape are criminally associated with a robbery. *Williams v. United States*, D.C.App.1963, 190 A.2d 269. Flight from the scene of the crime with the actual perpetrators has been said to justify the same inference. *Corbin v. United States*, D.C.App.1968, 237 A.2d 466. Even remaining with a group after disclosure of the intention of members of the group to commit a crime has been held to be sufficient evidence of association with the criminal venture. *People v. Hill*, 1968, 39 Ill.2d 125, 233 N.E.2d 367.

## V.

Each of the following constitute an act of racketeering activity within the meaning of Section 1961(1) of Title 18 of the United States Code:

(a) The Castellitto murder, committed on June 6, 1961, by Anthony Provenzano, Salvatore Briguglio, Harold "K.O." Konigsberg and Salvatore Sinno in violation of the laws of the State of New York.

(b) The Middlesex County Loansharking Transaction committed during March of 1967 by Thomas Andretta and Armand Faugno in violation of New Jersey law (extortion).

(c) The Skil Tool Theft, committed during 1968 by Thomas Andretta and Frederick Salvatore Furino in violation of 18 U.S.C. § 659.

(d) The counterfeiting committed during 1971 by Salvatore Briguglio, Thomas Andretta, Armand Faugno and three others in violation of 18 U.S.C. § 472.

(e) The Seatrain "Labor Peace" Payoffs, committed between 1969 and 1977 by Anthony Provenzano, Stephen Andretta, Thomas Andretta and Gabriel Briguglio in repeated violation of 29 U.S.C. § 186.

(f) The City-man "Labor Peace" Payoffs, committed between 1971 and 1980 by Nunzio Provenzano and Irving Cotler in repeated violation of 29 U.S.C. § 186.

(g) Receipt of kickbacks by Anthony Provenzano, aided and abetted by Salvatore Briguglio and Stephen Andretta, in connection with the Romano loans between 1974 and 1977, in violation of 18 U.S.C. § 1954.

(h) Continuously between approximately 1961 and the present, Anthony Provenzano, Nunzio Provenzano, Stephen Andretta, Thomas Andretta, Salvatore Briguglio, aided and abetted by the defendant officers and business and business agent of Local 560, unlawfully affected commerce and the movement of articles and commodities in commerce by extorting certain intangible property rights— rights to union democracy under § 401 of the LMRDA—from the membership of Local 560, in repeated violation of 18 U.S.C. § 1951.

(i) Union members enjoy the federally protected right to participate in the affairs of their labor organization in a democratic fashion. Fundamental to the democratic process is the right to voice publicly one's opposition to and criticism of the policies, decisions, proposals and activities of the incumbents, the right to run for union office and the right to promote the candidacy of others against the incumbents. The ability to exercise such rights free from unreasonable interference constitutes property within the meaning of 18 U.S.C. Section 1951. *United States v. Local 560*, 550 F.Supp. 511 (D.N.J. 1982).

(ii) The wrongful use of actual or threatened force or violence or of fear of economic or physical harm in order to cause the membership of a labor organization to surrender such federally protected rights constitutes extortion within the meaning of 18 U.S.C. § 1951(b)(2). *United States v. Sweeney,* 262 F.2d 272 (3d Cir.1959), *United States v. Kenny,* 462 F.2d 1205 (3d Cir.) *cert. denied,* 409 U.S. 914, 93 S.Ct. 234, 34 L.Ed.2d 176 (1972); *Stirone v. United States,* 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960); *United States v. Provenzano,* 334 F.2d 678 (3d Cir.), *cert. denied,* 379 U.S. 947, 85 S.Ct. 440, 13 L.Ed.2d 544 (1964) (fear of wrongfully threatened economic loss also satisfies Hobbs Act); *Carbo v. United States,* 314 F.2d 718, 740 (9th Cir.1963), *cert. denied,* 377 U.S. 953, 84 S.Ct. 1626, 12 L.Ed.2d 498 (1964) (knowledge or belief that defendants were "underworld" men or "strongarm" men sufficient); *United States v. DeMasi,* 445 F.2d 251, 257 (2d Cir.1971); *United States v. Stubbs,* 476 F.2d 626 (6th Cir.1973) (reputation for violence sufficient); *United States v. Billingsley,* 474 F.2d 63, 66–67 (6th Cir.1973) (general bad reputation sufficient).

(iii) The climate of intimidation—which has been generated within Local 560 as a result of the Castellitto murder and the allegations regarding the Glockner murder, the many other criminal acts attributed to the Provenzano Group (as detailed in section II B of this opinion), the repeated appointment of convicted criminals and persons reputed to be involved in criminal activity to positions of trust within the Local, and their persistent refusal to remove such persons from positions of trust and to prevent known criminals from frequenting the union offices or to take any other steps to ensure union democracy—has created a justifiable perception and resulting fear among a substantial portion of the membership of Local 560 that such a wrongful use of

actual and threatened force and violence and of disastrous and irreparable economic harm are likely to result from any public or visible demonstration of opposition to or criticism of the policies, proposals, decisions or activities of the incumbents of the Provenzano Regime.

(iv) The use of such extortion against the membership of Local 560 does affect commerce and the movement of articles and commodities in such commerce. *United States v. Provenzano,* 688 F.2d 194 (3d Cir.1982); *United States v. Provenzano,* 620 F.2d 985 (3d Cir.1980). (Local 560 party to contracts with companies engaged in interstate shipment of commodities).

These acts of racketeering constitute a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

Since the late 1940's Anthony Provenzano has been the leader of a group of individuals who have been associated together in fact as an illicit enterprise within the meaning of 18 U.S.C. § 1961(4). This group of individuals, the Provenzano Group, is presently composed of Anthony Provenzano, Nunzio Provenzano, Stephen Andretta, Thomas Andretta, Gabriel Briguglio and Andrew Reynolds, and has in the past included among its associates Salvatore Briguglio (until his murder in 1968), Salvatore Sinno (until his defection in 1961), Harold "K.O." Koningsberg (until his incarceration in the mid-1960's), Armand Faugno (until his "disappearance" in 1972), Ralph Michael Picardo (until his defection in 1975), Ralph Pellecchia (until his incarceration), and Frederick Salvatore Furino (until his murder in 1982). The Provenzano Group Enterprise did affect interstate commerce. *See United States v. Provenzano,* 620 F.2d 985 (3d Cir.1980).

Continuously between approximately 1950 and the present, the aforesaid defendants, as individuals associated with the Provenzano Group Enterprise, unlawfully conducted and participated, directly or indirectly, in the conduct of that Enterprise through a pattern of racketeering activity, in continu-

ing violation of Sections 1962(c) and 2 of Title 18 of the United States Code. The individual associates' culpability under § 1962(c) has been established by their own acts of racketeering, by their aiding and abetting the conduct of other associates, and, under *Pinkerton*, by the conduct of their co-conspirators.

Throughout this period, the defendant associates of the Provenzano Group Enterprise understood the scope of the Enterprise and had knowledge that other associates were performing tasks related to the criminal operation of the Group as such. Each had a knowing dependence upon the others for his own profit and position. The defendant associates knowingly and intentionally agreed to further the Provenzano Group Enterprise through the commission of various racketeering offenses. *See United States v. Riccobene*, 709 F.2d 214, 225 (3d Cir.1983). Therefore, I conclude that the defendant associates of the Group conspired to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d). This conspiracy continues to this day. *See United States v. Armocida*, 515 F.2d 29, 47 (3d Cir.1975); *United States v. Cappetto*, 502 F.2d 1351, 1358 (7th Cir.1974).

 Local 560 and its benefit funds and severance pay plan also constitute an enterprise—the Local 560 Enterprise—within the meaning of 18 U.S.C. § 1961(4), the activities of which affect interstate commerce. Continuously between approximately 1961 and the present, defendants Anthony Provenzano, Nunzio Provenzano, Salvatore Briguglio, Stephen Andretta, Thomas Andretta, Andrew Reynolds and perhaps others unlawfully acquired and maintained, directly and indirectly, an interest in and control of the Local 560 Enterprise through a pattern of racketeering activity, in continuing violation of Sections 1962(b) and 2 of Title 18 of the United States Code. As with the § 1962(c) violation, the culpability of the individual associates of the Provenzano Group under § 1962(b), as well as their aiders and abettors, has been established by their own conduct, by their aiding and abetting the

acts of racketeering of others, and, under *Pinkerton*, by the racketeering acts of their coconspirators.

Throughout this period, these defendants knowingly and intentionally agreed to acquire and maintain, both directly and indirectly, an interest in and control of the Local 560 Enterprise through the commission of various racketeering offenses. Each of these defendants understood the scope of this agreement and had knowledge that others were performing tasks related to the accomplishment of their purpose. Therefore, I conclude that these defendants also unlawfully conspired to violate 18 U.S.C. § 1962(b), in violation of 18 U.S.C. § 1962(d). *See United States v. Riccobene*, 709 F.2d 214, 225 (3d Cir.1983). This conspiracy also continues to this day. *See United States v. Armocida*, 515 F.2d 29, 47 (3d Cir.1975); *United States v. Cappetto*, 502 F.2d 1351, 1358 (7th Cir.1974).

Further, during their respective periods of incumbency, defendants Salvatore Provenzano, J.W. Dildine, Michael Sciarra, Stanley Jaronko, Joseph Sheridan, Josephine Provenzano and Thomas Reynolds, Sr., did aid, abet and facilitate the commission of the § 1962(b) violations. This complicity was exhibited through their appointment and retention in office of certain officials of Local 560 and in their discharge of certain other duties, the collective impact of which has, in particular, directly and substantially contributed to the existence of the climate of intimidation within the Local.

The officers of a labor organization occupy positions of trust in relation to that organization. As such, it is their duty to, among other things, hold the money and property of the labor organization on behalf of its members. *See* 29 U.S.C. § 501(a). Such officers should adhere to the highest standards of responsibility and ethical conduct in administering the affairs of their labor organization. *See Local 107 v. Cohen*, 182 F.Supp. 608 (E.D.Pa.1960), *affirmed*, 284 F.2d 162 (3d Cir.1960). Additionally, the officers have an affirmative duty and responsibility to ensure to the extent possible that the persons whom they

appoint and retain in any position of trust within the labor union will adhere to the same high standards of responsibility and ethical conduct in administering the affairs of the union. In making such appointments, the incumbent union officers have an affirmative duty to insure that they obtain the true facts with respect to the character of the potential appointee and his or her discharge of the obligations of the position. An unreasonable failure to learn the true facts as to such appointments exposes these incumbent officials to liability for such conduct. *See United States v. Andreadis,* 366 F.2d 423, 430 (2d Cir.1966); *Francis v. United Jersey Bank,* 87 N.J. 15, 31, 432 A.2d 814 (1981). Similarly, in making such appointments, the incumbent officers have an affirmative duty to evaluate, to the greatest extent possible, the impact which any particular appointment might reasonably be expected to have on the membership in light of existing circumstances. *See Lamonte v. Mott,* 93 N.J.Eq. 229, 236–37, 107 A. 462 (Err. & App.1921).

Therefore, given the circumstances present within Local 560 during their respective periods of incumbency, the following conduct of the defendant officers of Local 560 was highly improper and constitutes gross misconduct:

(a) the repeated appointment of numerous individuals who had substantial criminal records (often involving crimes of violence or labor racketeering offenses) without any offsetting basis to believe that the individual would abstain from criminal conduct and meet the standards for ethical and appropriate conduct in administering the labor organization.

(b) the refusal to take any action to remove those appointees whose conduct, once in office, was clearly improper—particularly the refusal to take such action in the face of compelling circumstances such as formal allegations or proof of renewed criminal conduct, or a subsequent criminal conviction for a crime involving a direct breach of trust to the membership.

(c) the expenditure of Local 560 assets for the benefit of Anthony Provenzano who has three times committed offenses while in office, each of which constituted a direct and serious breach of trust towards the Local's membership.

(d) the reckless indifference to the persistent and systematic misconduct of fellow incumbent officers with respect to, (1) a pattern of, at best, unsuitable appointments, (2) a pattern of access to the union's offices by known or reputed criminals, and (3) a pattern of non-beneficial expenditures of Local 560 assets.

■ Both as gross misconduct and independently thereof, this conduct constitutes aiding and abetting of the violations of 18 U.S.C. § 1962(b). This conduct has facilitated the acquisition and maintenance, both directly and indirectly, of control of Local 560 by the Provenzano Group, most strikingly in the appointment of Group associates to officer positions, but also in contributing to the climate of fear and intimidation within the union and otherwise assisting the Provenzano Group to achieve its objectives.

The Provenzano Group, which in essence is a carefully structured and well disciplined conspiracy, has been in substantially continuous existence throughout the past thirty years, and is likely to continue. The very conditions within Local 560 which have enabled and encouraged the Provenzano Group to gain and maintain control over it and to exploit it as an instrumentality for the systematic and repeated commission of labor racketeering offenses continue in place today. Unless these conditions are changed, there is a substantial likelihood that the racketeering violations which have victimized both the membership and the affected portions of the trucking industry will recur. *See United States v. Oregon State Medical Society,* 343 U.S. 326, 333, 72 S.Ct. 690, 695, 96 L.Ed. 978 (1952). *See also Local 167 v. United States,* 291 U.S. 293, 298, 54 S.Ct. 396, 398, 78 L.Ed. 804 (1934).

■ Continuously throughout approximately the last quarter of a century, the associates of the Provenzano Group have

dominated Local 560 through fear and intimidation, extorting the membership's union democracy rights, and have exploited it through fraud and corruption. Because the conditions within Local 560 which have been the *sine qua non* for the reported commission of acts of these defendants remain, I must conclude that future violations of 18 U.S.C. § 1962(b), (c) and (d) are likely to occur, thereby resulting in irreparable harm to the membership of Local 560, its contract employers, and the public. *See Commodity Futures Trading Commission v. Hunt*, 591 F.2d 1211, 1220 (7th Cir. 1979); *United States v. Spectro Foods Corp.*, 544 F.2d 1175, 1180 (3d Cir.1976); *Securities and Exchange Commission v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1100 (2d Cir.1972). In order to prevent and restrain such future violations of § 1962, it is necessary to enjoin defendants Stephen Andretta and Gabriel Briguglio from any future contacts with Local 560, and to remove the current members of the Local 560 Executive Board in favor of the imposition of a trusteeship for an appropriate period of time, which will terminate following the completion of supervised elections.

 I have additionally determined to exculpate the institutional defendants herein, specifically Local 560 itself and its Funds and Plan. In order to attribute the misconduct of the individual defendants to these institutional defendants, I must find (1) that the individual defendants committed the acts of racketeering in the scope of their employment, and (2) that they thereby intended to advance the affairs of the institutional defendants. *See New York Central Railway v. United States*, 212 U.S. 481, 493–99, 29 S.Ct. 304, 306–08, 53 L.Ed. 613 (1909). While it is clear that the individual defendants acted within the scope of their employment in committing the various criminal acts previously recited, it is equally obvious that their intent was not to advance the affairs of their employers. To the contrary, the institutional defendants in this action were the victims. The associates of the Provenzano Group, aided and abetted by the other defendants herein, intended by their actions to control and exploit Local 560 to its detriment. I therefore conclude that there is no basis for retaining either Local 560, the Funds or the Plan as a defendant in this action, except insofar as it is necessary to retain Local 560 as a nominal defendant to effectuate the equitable relief heretofore specified and as may be ordered in the future.

## VI.

In sum, I have determined that the individual defendants herein have violated 18 U.S.C. § 1962(b), (c) and (d). Because of the likelihood of continued violations, I have determined to enjoin defendants Stephen Andretta and Gabriel Briguglio from any future contacts of any kind with Local 560, and to remove the current members of the Local 560 Executive Board in favor of a trusteeship. This trusteeship shall continue for such time as is necessary to foster the conditions under which reasonably free supervised elections can be held, presumptively for eighteen months.[31] I have, however, decided to stay the effect of this injunctive relief pending appeal, and have also decided to defer the naming of the trustee(s) until the completion of any such appellate proceedings. Finally, I have decided to dismiss Local 560, the Funds and the Plan from this action, except insofar as I must maintain jurisdiction over Local 560 as a nominal defendant in order to effectuate the equitable relief heretofore specified or as may be ordered in the future.

Plaintiff shall submit an order in conformance with this opinion within seven (7) days.

---

**31.** Because the membership of Local 560 has been victimized, it would be anomolous to fail to recognize that in addition to accomplishing the previously stated remedial objectives, it is crucial to ensure that economic benefits presently secured by various collective bargaining agreements, be protected and legitimately enhanced *in futuro*. I need not enlarge upon this theme at this time.